366 A.2d 1259

**Harry DIESEL and Leona Diesel**

**v.**

**Charles N. CAPUTO, Appellant.**

Superior Court of Pennsylvania.

Argued April 16, 1976.

Decided Dec. 15, 1976.

196

Gilbert J. Helwig, Pittsburgh, for appellant.

Frank J. Kernan, Pittsburgh, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

This appeal is taken from the entry of judgment on a jury verdict in the amount of $55,000 in favor of the appellees, Mr. and Mrs. Diesel. After thorough review of the record, we have concluded that a judgment in the amount of $55,000 is not supported by the record. Further, the question of damages, if any, being inextricably intertwined with the question of liability,[1] and the record revealing a tortuous and oft confusing presentation of the question of liability, we have concluded that a new trial must be granted the appellant.

The facts, as developed at trial and taken in the light most favorable to the verdict winner, the appellees, are succinctly summarized in the opinion of the lower court:

"The plaintiffs, husband and wife, responded to a classified advertisement in the Pittsburgh Press, calling for, 'two investors—for an exciting fascinating, very profitable private club,' and were placed in contact with one Samuel 'Sonny' Peters. They were advised that the investment opportunity involved a one-third ownership in a 'private club' to be operated by a non-profit corporation called the 'Argonne Club'.

"The representation continued that one Izzy Weinstein had been located as an investor, and that each, that is to say, Peters, Mr. and Mrs. Diesel and Izzy Weinstein, were to invest Thirty Thousand ($30,000.-00) Dollars in the venture. Peters had previously obtained from a Mr. Leon Thorpe a five year lease with an additional five years on premises situate in the Market Square area of downtown Pittsburgh. The plaintiffs then invested Twenty Thousand ($20,000.-00) Dollars of their savings into the venture causing this sum to be placed into a bank account under the style, 'Argonne Club' maintained at the South Hills

---

1.  Moreover, on the record before us, we are not persuaded that the question of liability has been fairly settled on sufficient evidence. See text supra; see Am.Jur.2d New Trial, § 27 (1971).

Village Office of Pittsburgh National Bank. Peters then entered into a contract with a DeRamo Construction Company to have the leased premises converted into a facility suitable for the operation of a 'private club'. While the construction work was in progress, a notice of an application for the transfer of a club liquor license to the premises was posted on the premises and was seen by the plaintiffs. It was signed by the defendant, Charles N. Caputo, as President of the Italian American Professional and Business Men's Association (IAPBA). Upon inquiry to Peters, the plaintiffs were advised that the name of the non-profit corporation was not important, and that he, Peters, had agreed to pay Seven Thousand Five Hundred ($7,500.00) Dollars to the defendant, Mr. Caputo, for his 'services' in causing the liquor license to be transferred to the premises. The defendant, Charles N. Caputo, cashed a check in the amount of Five Thousand ($5,000.00) Dollars drawn against the Argonne Club account in the amount of Five Thousand ($5,000.00) Dollars, which he endorsed. It should be noted that the defendant, Mr. Caputo, testified that he did not receive the Five Thousand ($5,000.00) Dollars, but rather endorsed the check and presented it to the bank merely as an accommodation to Mrs. Peters, a person he hadn't seen for a number of years. The creditability of that testimony was, of course, for the jury's determination.

"Apparently, serious problems were presented which prevented the transfer of the liquor license issued to the Argonne Club, thus, it was necessary to 'find' another club to accomplish the same purpose. This resulted in the use of the Charter issued by the Commonwealth of Pennsylvania to the Italian American Professional and Business Men's Association (IAPBA). A lease of the premises was then signed on behalf of the IAPBA by the defendant, Charles N. Caputo, Pres-

ident. The name of the operation was to be 'Showboat Supper Club'.

"Prior to the opening of the venture, Peters represented to the plaintiffs that the third investor, Izzy Weinstein, had withdrawn and that the opportunity was now provided for Peters and the plaintiffs to increase their respective equities by the investment of additional sums, whereupon the plaintiffs invested an additional Fifteen Thousand ($15,000.00) Dollars. Still later, and contemporaneous with the opening of the Showboat Supper Club, the plaintiffs invested an additional Nine Thousand Six Hundred Thirty Two and 99/100 ($9,632.99) Dollars. The club opened. Peters supervised the bar and his nephew officiated at the door, while Mrs. Diesel served as cook and Mr. Diesel kept the books of the business.

"It was then discovered that, notwithstanding the representations made by Mr. Peters, the entire operation was as a result of the investment made by the plaintiffs, Mr. Peters having invested Twenty ($20.00) Dollars. It was further discovered that Peters had appropriated money from the cash register and that he had further appropriated money paid for 'memberships'.

"When the fraud was discovered, plaintiffs requested Leon Thorpe to lease the premises to the plaintiffs, but were advised that Mr. Thorpe could only deal with the defendant, Charles N. Caputo. The plaintiffs then met with the defendant, Charles N. Caputo, and confronted him with the fraud. *The plaintiffs requested that Mr. Caputo cause the premises to be turned over to them so that they could salvage their investment.* Peters admitted the fraud. Mr. Caputo, however, rather than accede to the plaintiffs' request that he turn over the operation to the plaintiffs, advised the plaintiffs to pay an additional Ten Thousand ($10,000.00) Dollars to Mr. Peters. It was shortly

after this action on the part of the defendant, Charles N. Caputo, that the plaintiffs sought legal counsel and the instant action was commenced." [2] (Emphasis added.) (Footnote added.)

If at this juncture, the unfortunate circumstances in which the plaintiffs found themselves do not arouse the sympathy of even the most casual observer, the procedural posture of the ensuing cause of action is certainly of a most disconcerting nature.

On January 21, 1972, the plaintiffs filed a complaint in equity [3] naming as defendants therein, Samuel and Norma Peters, Charles N. Caputo, and the Italian American Professional and Business Men's Association (IAPBA). [4] The essence of the complaint, as it related to

---

2. Some time after January 21, 1972, the date on which the plaintiffs filed their complaint in equity, the Italian American Professional and Business Men's Association (IAPBA) was placed in receivership, and its dissolution was concluded after the instant trial.

3. The plaintiffs sought the following relief:
"a. To issue a preliminary injunction directing the defendants to pay the rent when due, enjoining them from doing anything to cause a forfeiture of the lease, enjoining them from paying any further sums to themselves from the receipts or assets of the IAPBA or Showboat, directing them to deposit into escrow all receipts except necessary rents, employee wages, and business expenses, and directing them to account to the Court and to the plaintiffs monthly, throughout the pendency of this lawsuit, for all receipts and expenditures.
"b. To order the defendants, jointly and severally to reimburse plaintiffs for all moneys expended by plaintiffs and to account for and pay over to plaintiffs all receipts.
"c. To enter judgment against defendants jointly and severally for all sums to which plaintiffs may be entitled; and
"d. To order defendants to satisfy the obligations signed or guaranteed by plaintiffs.
"e. To declare a resulting trust in favor of the plaintiffs and against all defendants.
"f. To award plaintiffs punitive damages.
"g. To grant such further equitable relief as may be necessary and appropriate."
Printed Record at 8a.

4. Plaintiffs' pre-trial statement claimed the following in damages:
"1. Plaintiff claims compensatory damages of $44,632.99 in deposits of which defendants defrauded them, $500.00 for fire in-

Charles N. Caputo, the appellant, was an allegation that Caputo was, from the beginning, a participant in a conspiracy to defraud the plaintiffs.[5] On February 11, 1972, defendants, Samuel and Norma Peters and IAPBA filed preliminary objections in which they averred, *inter alia:* "1. Plaintiffs have a full, complete and adequate remedy at law." Printed Record at 9a. Caputo filed an answer and new matter on February 28, 1972, the essence of which was a denial of any complicity in the scheme to defraud. By order of the court below, dated June 19, 1972, plaintiffs' case was transferred to the law side of the court, and Samuel and Norma Peters and IAPBA[6] were ordered to file answers within twenty days.[7]

At a pre-trial conference on January 3, 1974, Caputo filed a motion with the court to vacate its order of June 19, 1972 (certifying this case as an action at law), and to

surance protection, $1,500.00 for the inventory, $2,400.00 for rental payments, $1,801.50 they were required to pay to Pittsburgh National Bank on a note they signed as accommodation endorsers and a judgment of $4068.01 has been entered on another such note for total compensatory damages in the amount of $54,902.50. In addition, plaintiffs claim punitive damages." Printed Record at 19a.

5. The complaint alleged, *inter alia:*
"[R]epresentations made by defendant, Samuel Peters, *on his own behalf and on behalf of the other defendants,* were false and made with the intend [sic] to defraud plaintiffs . . . ." Printed Record at 6a (emphasis added).
"Each of the defendants, with knowledge of the fraud perpetrated on the plaintiffs by the defendant, Samuel Peters, *joined in and ratified said fraud* . . . ." Printed Record at 7a (emphasis added).

6. The order as it related to IAPBA was as follows:
"a. Defendant Italian American Professional and Businessmen's Association is ordered to file an Answer within 20 days of the date on which the Court either dissolves the receivership [*see* note 2 supra] at number 2312 July Term, 1972 or makes the appointment of the receiver permanent." Printed Record at 17a.

7. The individual defendants, Samuel and Norma Peters, never filed answers and "plaintiffs eventually took default judgments against them." Brief for Appellant at 4. The corporate defendant, IAPBA, was hopelessly insolvent. *See* note 2 supra.

transfer this action to equity. By order dated January 4, 1974, Caputo's motion to transfer this action to equity was denied. Subsequently, Caputo renewed his motion [8] to transfer, which motion was again dismissed [9] by order dated January 27, 1975. Trial commenced on April 7, 1975.

At the beginning of the trial it immediately became apparent that the nature of the plaintiffs' claim against Caputo had changed. Plaintiffs abandoned their theory that Caputo was a participant in the original scheme to defraud, and proceeded against Caputo on a theory of restitution. The record is replete with evidence of this change in theory. In plaintiffs' counsel's opening address to the jury he stated, *inter alia:*

"But the principle law says this. When property is fraudulently diverted, when it comes into the hands of a third person, that third person not only has the moral obligation but also the legal obligation when he knows he is in possession of something that has been taken through fraud, he has to give it back to the victim."

N.T. at 20.[10]

---

8. In renewing his motion to transfer, Caputo also moved for a separate trial. *See* Pa.R.C.P. No. 213(b). This motion was granted on the ground that, *inter alia,* "the only Defendant who has filed a responsive pleading is the Defendant Charles V. [sic] Caputo, and further, that prejudice to the Defendant Caputo could result if the motion for a severance were not granted." Printed Record at 64a.

9. Plaintiffs opposed the transfer to equity:
"Defendant Caputo wants the June, 1972, Order vacated because he does not want a jury trial.
"In view of the fact that the Showboat is defunct, it is obvious that none of the equitable relief plaintiffs originally sought [see note 3 *supra*] would be appropriate. The only remedy now available to plaintiffs is a money judgment." Printed Record at 58a.

10. Appellant contends that the abandonment of the conspiracy theory and the shift to a theory of restitution constituted an improper variance prejudicial to the defendant. During the course of the trial, counsel for both parties requested a meeting in chambers in order that the substance of a pre-trial conference, held

The trial judge in his instructions to the jury stated in pertinent part:

"Now there is another principle that you should know, and that is that where property is fraudulently converted and diverted from its proper use, the third party into whose hands the property falls without consideration, *even though he be innocent of the fraud in the inception, that is to say the original fraud,* has the obligation to restore to its rightful owner the property wrongfully appropriated where he has knowledge of the fraud. Now it goes without saying I think, but I am going to make sure we understand, *we are not here concerned with whether this defendant involved himself in the original fraud, alleged fraud, I should say, which induced the parting of the funds. The plaintiff does not allege that. That is not the concern.* The concern in this issue is whether firstly there was fraud

with the trial judge immediately prior to the swearing of the jury, be summarized for the record. During the meeting, appellant's counsel wanted the record to reflect that plaintiffs' counsel had conceded during the pre-trial conference that "they would have no evidence that Mr. Caputo had participated in the original fraud . . . ." N.T. at 400. It was at this time that appellant's counsel was attempting to preserve a variance objection: "[A]nd while there was at that time [pre-trial conference] no—as I gathered, no formal need to state an objection to what I felt may be a change of theory in the Complaint, I did voice the fact that in addition to other objections which I may ultimately make to the submission of this case to the jury on that theory [restitution] that I wanted to reserve the ground that it may involve a variance . . . ." N.T. at 401. Plaintiffs' counsel did admit at this meeting that: "I did also state that I had no evidence of Mr. Caputo's participation in the original fraud." N.T. at 404. However, he concluded: "[C]ertainly, if some evidence develops in this trial, you know, I do intend to rely on that. Certainly at this conference I was not waiving any cause of action which might spring from his [Caputo] duty to his inquiry, for instance, where the money was coming from, his liability for any illegal conduct of his own in peddling a liquor license." N.T. at 404. We believe that there is no merit to the variance claim for as appellant's counsel admits, prior to the trial he was sufficiently apprised of the change in theory and cannot claim that he was misled. However, this does not alter our conclusion that the "new theories" as presented were not sufficiently explicated, and that a new trial limited to damages would not be the appropriate disposition of this case. *See* text infra.

in the inducement which caused the plaintiffs to part with funds and then whether or not the defendant became aware of this frauded knowledge of the fraud, and if the defendant did have knowledge of this fraud, whether the defendant was in a position to transfer the assets or make available of the assets which could be traced to the funds procured by the original fraud." N.T. at 807 (emphasis added).

And, the lower court noted in its opinion: "For reasons best known to plaintiff's counsel, the plaintiffs do not allege that the defendant, Charles N. Caputo, had any complicity in the fraud. The plaintiffs rely upon the principle [of restitution] . . . ." Printed Record at 203a. Hence, upon a "theory" of restitution the jury returned a verdict of $55,000 against Mr. Caputo.

## I.  DAMAGES

This is an action at law, and restitution as a form of relief, under the facts of this case, is potentially available under two theories.  The first is an action in assumpsit, on a theory of quasi-contract, with relief in the nature of *restitution* measured by the amount of *unjust enrichment* to the defendant, Caputo.  The second is an action in trespass, on a theory of conversion, with relief in the nature of *restitution* measured by the amount of the *plaintiffs' loss* (in turn measured by the value of the property converted at the *time* of conversion).

At this juncture, we *assume arguendo* that both theories are supported by the evidence in this case, and focus solely on the question of damages.

### A.  Restitution—Form of Relief in Assumpsit

It is hornbook law that restitution as a form of relief in assumpsit is in the nature of disgorging the amount of *unjust enrichment,* if any, to the defendant.

Instantly, the jury's verdict in the amount of $55,000 represents the plaintiffs' *investment* in the Showboat enterprise, *see* note 4 supra, and does not necessarily reflect the amount of *unjust enrichment,* if any, to the defendant. In fact, after a thorough review of the record, the only specific amount of *unjust enrichment* we can find is the $5,000 Caputo received for his "services in causing the liquor license to be transferred to the premises." *See* text supra (opinion of the lower court). The plaintiffs argue that the mere fact that Caputo possessed [11] legal title to the lease and the supper club improvements, constituted an unjust enrichment. *Assuming arguendo* the plaintiffs are correct as a matter of law, there is still no showing that the value of legal title to the lease and the improvements, in view of the impending insolvency of the "Showboat Club" was equal to an amount of $55,000, the plaintiffs' investment. On a theory of unjust enrichment, a verdict of $55,000 is not supported by the record.

### B. *Restitution—Form of Relief in Trespass*

*Assuming arguendo* that plaintiffs established liability on a theory of conversion, *but see* text infra, it is also hornbook law that restitution as a form of relief is the value of the property converted *at the time of conversion.* Recall that the plaintiffs' theory is not that Caputo was a tortious participant in the original scheme to defraud. His tortious conduct, if any, would be at the time he retained *legal title* to the lease and the improvements in the face of the plaintiffs' demands. Once again, in view of the impending insolvency of the "Showboat Club" an award of $55,000 (the amount of the plaintiffs' investment) is not supported by the record.

11. The jury found that IAPBA was the "alter ego" of Caputo.

■ In summary, *assuming arguendo* that plaintiffs established the criteria for restitution on a theory of unjust enrichment and/or restitution on a theory of conversion, the record does not support a finding that Caputo is liable in the amount of $55,000. In fact, the following is the complete charge to the jury on the issue of damages:

"Now we move on to the damages. If you get that far in your deliberations, then to determine what the damages are is a question of fact. You have heard the testimony, the exhibits are in evidence, and I will not review that. That is for your deliberation.

"But there has been mention of a doctrine—both counsel have mentioned it—they used the term 'avoidable consequences.'

That principle that they have referred to is known by other names to the law. Sometimes we refer to it as mitigation of damages. Other times we refer to it as amelioration of damages, or avoidable consequences. But basically what that doctrine says is that a person who has suffered damages has the duty to attempt to lessen those damages as much as possible, to mitigate those damages, to ameliorate the damages, to avoid them, if possible. Now to apply this doctrine in this particular case is a question which depends upon how you resolve the questions of fact. Now if you determine that the plaintiffs were asked to pay more to someone who allegedly defrauded them, the law would not require this. On the other hand, you have heard testimony relating to the time allegedly that this Mr. Peters put into the operation of these premises, and if you believe, and it is up to you to so determine, whether in fact services were provided by this Mr. Peters, then certainly you may consider that testimony which has to do with how much he demanded in determining these damages. As to the value of the improvements to this Showboat Club, that is something that you will have to establish after hearing all of the evidence

which you have heard and exhibits which you will take with you." Record at 136a–137a.[12]

It is clear that this instruction was inadequate in that it failed to delimit the issue of damages in terms of the underlying theories of liability.

## II. LIABILITY—NEW TRIAL
## GENERALLY

From our discussion of the question of damages it is obvious that the question of damages, if any, is inextricably intertwined with the theory of liability urged and proven, and, as such, a new trial generally must be granted. Moreover, there being a substantial dispute as to liability, especially on the theory of conversion, and the nature of the record before us being uncertain in matters material to the determination of liability, a new trial generally is particularly appropriate.[13]

Without entering into a protracted discussion of the theories of liability as they relate to the facts of this case, suffice it to highlight the tortuous nature of the record and the uncertainty that is present on the question of liability.

12. We note on this issue that the question of damages was properly preserved for appeal. Defendant Caputo filed a request for binding instructions, and after the jury returned its verdict, he filed a motion for judgment non obstante veredicto and a motion for a new trial. In the lower court's opinion the court first concludes that on the merits of the case "[t]here is no basis for the granting of judgment non obstante veredicto," and then considers the defendant's motions for a new trial. On this motion the court concludes that the defendant's failure to make specific objections to the court's charge barred the defendant from claiming trial error. However, after review of the record, it is clear that defendant's counsel did lodge an objection to the court's charge on the damage issue. See N.T. at 817. We consider the issue of damages to have been properly preserved for appeal.

13. This is an excessive verdict case. For a summary of the principles by which we are guided in determining whether a new trial limited to damages, or a new trial generally should be ordered see Lambert v. P.B.I. Indus., Pa.Super., 366 A.2d 944 (1976).

At this juncture, two observations are in order. Recall that the plaintiffs abandoned their initial theory that Caputo was a participant in a conspiracy to defraud.[14] Further, in an attempt to resolve the confusion in this case, and bring sharply into focus the plaintiffs' right to recover against Caputo, plaintiffs, in their brief on appeal, have indicated that in the court below they exercised their right to "waive the tort and sue in assumpsit." Unfortunately, this "waiver" has compounded the confusion.

The plaintiffs' primary theory of liability, having "waived the tort and elected to sue in assumpsit," is founded on the Restatement of Restitution § 123 (1937):

"123. Bona Fide Transferee Who is Not a Purchaser For Value.

"A person who, non-tortiously and without notice that another has the beneficial ownership of it, acquires property which it would have been wrongful for him to acquire with notice of the facts and of which he is not a purchaser for value is, upon discovery of the facts, under a duty to account to the other for the direct product of the subject matter and the value of the use to him, if any, and in addition, to:

"(a) return the subject matter in specie, if he has it;

"(b) pay its value to him, if he has non-tortiously consumed it in beneficial use;

---

**14.** *But see* note 10 supra. In effect, the plaintiffs' attorney, it appears, wanted the best of both worlds. While plaintiffs' counsel's opening address to the jury and the trial judge's instruction to the jury, *see* text supra, specifically limited the focus of this case to Caputo's "possession" of property non-tortiously acquired and subsequently retained, much of the evidence presented at trial focused on Caputo's interaction with Peters throughout the entire scheme to defraud. It is not difficult for us to perceive that the jury's verdict in the amount of the plaintiffs' investment in the Showboat enterprise was heavily weighted by the continued left-handed infusion of conspiracy evidence, when the issue had been "abandoned."

"(c) pay its value or what he received therefor at his election, if he has disposed of it." [15]

This theory is consistent with plaintiffs' abandonment of the theory that Caputo was a participant in a conspiracy to defraud, and were it the only theory presented, the case might not be appropriate for a new trial generally.[16]

However, in an attempt to justify the verdict of $55,000, the plaintiffs on appeal interject a second theory of liability, section 151 of the Restatement of Restitution (1937):

"§ 151.   Value of Property Acquired by Consciously Tortious Conduct.

Where a person is entitled to a money judgment against another because by fraud, duress or other *consciously tortious conduct* the other has acquired, *retained* or disposed of his property, the measure of *recovery for the benefit received by the other is the value of the property at the time of its* improper acquisition, *retention* [17] or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it." (Emphasis added.) (Footnote added.)

Having "waived the *tort* and sued in assumpsit" reliance on this section is particularly troublesome. However, although the plaintiffs did not urge the link between section 123 and section 151, there is such a link in

15. Section 123 of the Restatement of Restitution (1937) is essentially the trial judge's instruction to the jury, *see* text supra, absent, however, a delimiting instruction on the nature of damages under section 123.

16. Section 123, under the plaintiffs' theory, called for Caputo, who was "non-tortiously" in possession of their property, to disgorge himself of the property in a manner set forth in section 123.

17. *Assuming arguendo* that this section is applicable to this case, *see* text following this note infra, the question of damages that we explicated *supra*, becomes immediately apparent.

appropriate cases. The Restatement of Restitution § 123, comment c at 508 (1937) provides:

"A person who, having acquired the property of another innocently and non-tortiously but without giving value therefor, learns of the interest of another therein, is under a duty to restore it to the owner within a reasonable time, *and any conduct of his thereafter which is inconsistent with the owner's interest is a conversion if the subject matter is a chattel so that the rule stated in § 128 would be applicable to the parties thereafter.*" (Emphasis added.)

The import of specifically urging comment c, as the link between the plaintiffs' liability theories, should be obvious. *Assuming arguendo,* all other requisites for a conversion can be established, *see Norriton East Realty Corp. v. Central-Penn Nat'l Bank,* 435 Pa. 57, 254 A.2d 637 (1969), at issue is whether that which Caputo allegedly converted is a *chattel.* In *Norriton East Realty Corp. v. Central-Penn Nat'l Bank,* supra at 60, 254 A.2d at 638, the Court noted the necessary elements for the cause of action of conversion: "Salmond defines conversion as an act of willful interference with a *chattel,* done without lawful justification, by which any person entitled thereto is deprived of use and possession."

■ Instantly, plaintiffs urge that albeit Caputo had legal title to the lease and improvements, at the time of their request for the return of said lease and improvements, a conversion took place when he retained these "chattels." In view of our disposition of this case, we do not decide whether, on the facts of this case, under a traditional view of the tort of conversion, or for that matter, should the parties urge an expanded view of the tort of conversion, a cause of action for the conversion of a lease and improvements can be sustained.[18]

18. We are mindful, of course, that fixtures cannot, under the traditional view, be the subject of an action for conversion. *See Norriton East Realty Corp. v. Central-Penn Nat'l Bank,* 435 Pa. 57, 254 A.2d 637 (1969).

Suffice it to observe that the issue was not adequately developed by the plaintiffs at trial. The bridge between section 123 and section 151 was not specifically urged below, and was not specifically covered by the trial judge's instruction to the jury.

In summary, (1) the award of damages not being supported by the record, (2) the question of damages being inextricably intertwined with the question of liability, and (3) the question of liability not being clearly explicated on the record, we must order a new trial generally.

Judgment vacated and a new trial ordered.

CERCONE, J., files a dissenting opinion, in which HOFFMAN, J., joins.

CERCONE, Judge (dissenting):

The instant appeal arises from a judgment entered in favor of appellees, Mr. and Mrs. Diesel, against Charles Caputo based upon a jury verdict in the amount of $55,000.00. The relief granted by the jury was by its nature restitutionary resting upon appellee's alternative theories of conspiracy to defraud, conversion or quasi-contract (unjust enrichment). Appellant's requests for binding instructions and judgment n. o. v., or, in the alternative, a new trial were denied. For the reasons which follow, we reverse.

Taking the evidence in the light most favorable to appellees, they established the following facts at trial. On March 7, 1971, the Diesels saw an advertisement in the *Pittsburgh Press* proclaiming an investment opportunity for "an exciting fascinating, very profitable private club, interested parties reply to Press S 579." Their reply to the advertisement led to their ill-fated meeting with Samuel "Sonny" Peters. Peters explained that the opportunity he had advertised was a one-third ownership of a private club in a bustling area of downtown Pitts-

burgh which would be operated under the charter of a not-for-profit corporation, the "Argonne Club." He explained that if the Diesels, the Peters and a third purported investor, Izzie Weinstein, each invested $30,000, a lucrative night club business could be established. Peters already had negotiated a lease with the owner of the proposed site of the club which was a building then being used for storage.

Persuaded by the prospects of the venture, the Diesels agreed to invest, and in April, 1971, they transferred $20,000 of their savings to a bank account in the name of "Argonne Club." Peters simultaneously contracted with DeRamo Construction Company to remodel the building they had leased into a night club. However, the matter of obtaining a liquor license for the club remained problematical at the beginning of this enterprise.

In May, 1971, when the Diesels were visiting the site while the remodeling was taking place, they saw that an application for the transfer of a club liquor license belonging to the Italian American Professional and Businessmen's Association (IAPBA) was posted on the premises. Mr. Caputo's name appeared on the notice of transfer as President of the IAPBA. Since the Diesels had never met Mr. Caputo, they asked Peters why the license to be transferred was listed in the name of the IAPBA. Peters explained that, for their purposes, the name of the club to whom the license was issued was unimportant, and that using the IAPBA license would facilitate the opening of the club. Peters explained that, instead of holding the liquor license and the lease in the name of the Argonne Club, they would hold them in the name of the IAPBA. The investment and management of the club, which would trade as "The Showboat Club," would still be theirs, as would the profits, in the form of salaries and returns on their capital investments. Peters further explained that the only consequence of this arrangement with the IAPBA was that Mr. Caputo would have to be paid $7,500 for transferring the liquor license

to their premises. Peters indicated that $5,000 had been paid to Mr. Caputo on that account, and at trial a check dated April 27, 1971, paid to cash, and endorsed by Mr. Caputo was offered into evidence.[1] Mr. Caputo also signed a reformed lease for the club site in his capacity as president of the IAPBA.[2]

Prior to the opening of the club Peters informed the Diesels that Mr. Weinstein, the person who was to have invested one-third the money, had withdrawn from the venture and, if the Diesels invested more money, they could increase their share from one-third to one-half ownership. The Diesels then invested $15,000. In July, when the club opened, the Diesels invested almost $10,000 more. The tasks involved in managing the club were divided as follows: Peters controlled the daily operations of the club; Mrs. Diesel worked in the kitchen; David Connors, Peters' nephew, was the club's steward, in charge of memberships, and the "doorman"; and Mr. Diesel did the bookkeeping.

Under the bookkeeping system that the Diesels had devised, in November, 1971 they discovered that Peters had not invested more than twenty dollars in the enterprise, which had been capitalized entirely by their investments, that Peters regularly took money from the cash register, and that Peters had appropriated the $25 membership fees paid by the club's patrons.

Having discovered the fraud, the Diesels asked Mr. Thorpe, their landlord, to lease the business premises to

1. Mr. Caputo disclaimed having received any money for transferring the license. He testified that Mrs. Peters asked him to endorse the check as an accommodation so that she could have it cashed at a branch of Pittsburgh National Bank other than the one upon which it was drawn. Although Mrs. Peters corroborated this story, the jury was entitled to disbelieve it, especially in light of the Diesels' subsequent testimony that Mr. Caputo told them he was still owed $2,500 for transferring the license.

2. Mr. Thorpe, the owner of the premises, testified that the change from Argonne Club to IAPBA was unimportant since, in either event, he expected to be paid by the Peters and the Diesels.

them, but Mr. Thorpe explained that he could only do that with the permission of IAPBA's president, Mr. Caputo. Subsequently, a meeting was arranged at Mr. Caputo's law office between Mr. Caputo, Mr. and Mrs. Diesel, and Mr. and Mrs. Peters. At that meeting the Diesels requested that Mr. Caputo turn the lease over to them and help them in ousting Mr. Peters from their partnership. Peters admitted all the allegations of fraud, but audaciously maintained that he must be paid $10,000, primarily his "unpaid" salaries, before he would withdraw from the partnership. He argued that, although he had not invested any money in the venture, it was through his efforts that the club was organized, built and operated. Although the Diesels tentatively agreed to meet Peters' demand, they soon changed their minds and refused. Mr. Caputo told them that, unless they settled their differences with Peters, he could not aid them in ousting him.[3] This statement was apparently made since Mr. Caputo was not involved in arrangements made between Peters and Diesel. Mr. Caputo recommended to the Diesels that they seek other counsel to help resolve the problem existing between the Peters and them. The club, which had been closed by a raid, remained closed. Shortly thereafter, the Diesels sought legal counsel and commenced the instant suit.

Initially filed in equity, appellees' complaint alleged that Mr. and Mrs. Peters, the IAPBA, and Mr. Caputo conspired to defraud them of more than $53,000.[4] Because an adequate remedy existed at law, the case was

3. It was during one of these discussions with Mr. Caputo that the Diesels learned that Peters still owed Mr. Caputo $2,500 for transferring the liquor license. Although the Diesels offered to pay him the money, Mr. Caputo declined their offer explaining that his agreement was with Peters and that he was looking to Peters for payment.

4. In addition to the Diesels' aforementioned investments, they advanced money for rent payments, liquor purchases, and fire insurance. They also co-signed notes and guaranteed loans in connection with the business.

transferred to the law side of the court. Ultimately, when Mr. and Mrs. Peters and the IAPBA, which was hopelessly insolvent and in receivership, failed to file an answer, and the lawsuit against Mr. Caputo was severed, appellees took judgment against the Peters and the IAPBA by default.

Immediately prior to trial, however, it became apparent that appellees had revised their theory of liability against appellant Caputo and abandoned their hopes of proving a conspiracy between Peters and Caputo to defraud them. Counsel, in chambers after the jury had been sworn, admitted that appellees had no proof that Mr. Caputo took part in the fraud perpetrated upon them by Peters. Instead, they wished to proceed on the theory set forth in *Brubaker v. County of Berks*, 381 Pa. 157, 161, 112 A.2d 620, 622 (1955): [5]

"[W]here property is fraudulently converted and diverted from its proper use, the third person into whose hands the property falls without consideration, even though he be innocent of knowledge of any wrongdo-

---

5. In abandoning the conspiracy to defraud theory, appellees were doubtless influenced by the heavy burden of proof which attends the theory of liability. As the Supreme Court stated in *Ballantine v. Cummings*, 220 Pa. 621, 630, 70 A. 546, 549 (1908):

"A 'conspiracy to defraud' on the part of two or more persons means a common purpose supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each understands that the other has that purpose." When evidence of the fraudulent combination is not direct and positive, but is circumstantial proof raising inferences from subsequent conduct, the court should determine, at the outset, whether the proof offered is sufficient. *Id.* at 631, 70 A. 546.

Furthermore, in making this determination the court should ask whether the proof of the conspiracy was "full, clear and satisfactory," and the proof may not consist of "disconnected circumstances, any one of which, or all of which, are more consistent, or just as consistent, with a lawful purpose as with an unlawful undertaking." *Id.* at 631, 632, 70 A. at 550. *Cf. Fife v. Great Atlantic and Pacific Tea Co.*, 356 Pa. 265, 52 A.2d 24 (1947); *Morris v. Halford*, 352 Pa. 138, 42 A.2d 411 (1945). If the proof falls short of the required standard, the court is obliged to direct a verdict for the defendant.

ing, has the obligation to restore to its rightful owner the property so wrongfully appropriated."

The principal difficulty with appellees' theory is that, except for $5,000 paid for transferring the liquor license, they failed to show that property fell into Mr. Caputo's hands.

Even if we were to assume that Mr. Caputo's actions qualified him as the "alter-ego" of the IAPBA,[6] the evidence clearly demonstrated that the IAPBA gave value for the improvements to the business premises.

The Restatement of Restitution § 123 provides:

"A person, who, non-tortiously and without notice that another has the beneficial ownership of it, *acquires property* which it would have been wrongful for him to acquire with notice of the facts and *of which he is not a purchaser for value* is, upon discovery of the facts, under a duty to account to the other for the direct product of the subject matter and the value of the use to him, if any, and in addition, to:

(a) return the subject matter in specie, if he has it;

(b) pay its value to him, if he has non-tortiously consumed it in beneficial use;

(c) pay its value or what he received therefor at his election, if he has disposed of it." [Emphasis added.]

Although Mr. Thorpe, the landlord, testified that he expected the Diesels and the Peters to pay the monthly rent of $1,200, the IAPBA was the lessee, and, in the event

---

**6.** Generally, of course, corporateness will be respected and not disregarded so that officers and members of a corporation will not be deemed to have received individually that which the corporation has received as an entity—in this case for example, through the lease, an interest in the fixtures and other improvements to the night club premises. However, "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." H. Henn, Law of Corporations 252 (2d ed. 1970).

that the Diesels and Peters defaulted on the rental payments, the IAPBA was bound to pay under the lease. The law is clear that:

"Where a person acquires title to property under such circumstances that *otherwise* he would hold it upon a constructive trust or subject to an equitable lien, he does not so hold it if he *gives value* for the property *without notice* of such circumstances." *Id.* at § 172 (1). [Emphasis added.]

Since, as appellees concede, there is no evidence that the IAPBA or Mr. Caputo as its alter ego, had notice of the fraud perpetrated upon the Diesels when the improvements to the leased property were made with the Diesels' money, and since the IAPBA gave value for whatever property it received,[7] both by transferring the liquor license and by permitting appellees to use the leased premises, appellees have not proved the underlying facts upon which their restitutionary theory of liability rests.

However, the payment to Mr. Caputo of $5,000 is recoverable by the Diesels. Although Mr. Caputo denied ever having received that sum, the evidence offered at trial warranted the jury's conclusion that he did receive the money. Furthermore, there is no proof that Mr. Caputo gave value in return for the $5,000, since the liquor license which was transferred was not Mr. Caputo's, it was an asset of the IAPBA. At best, the evidence supports the inference that Mr. Caputo usurped a corporate opportunity [8] which, given his preexisting fiduciary duty to the IAPBA, does not constitute "giving value" as between the Diesels and him.

Hence, although appellees have failed to prove that appellant took part in the fraud perpetrated upon them, or

7. Indeed, there is a more subtle difficulty with appellees' theory. Virtually all the improvements to the night club were fixtures, and fixtures are not susceptible to conversion. See *Norriton East Realty Corp. v. Central Penn Nat'l Bank,* 453 Pa. 57, 254 A.2d 637 (1969). See also 18 Am.Jur.2d, *Conversion* § 20.

8. H. Henn, Corporations 462–65 (2d ed. 1970).

218

that appellant was "enriched" by the improvements made on the business premises, the jury properly concluded that appellant, as an individual, was unjustly enriched in the amount of $5,000 in connection with the transfer of the liquor license. Since it is our power to amend any judgment to conform to the proof offered at trial,[9] for the foregoing reasons I would reduce the judgment entered in the court below to $5,000.

HOFFMAN, J., joins in this dissenting opinion.

---

**9.** See 9 Standard Pa. Practice § 164 (Rev.ed. 1962).