UNIVERSAL COMPUTER SYSTEMS,
INC., Plaintiff,

v.

ALLEGHENY AIRLINES, INC.,
Defendant.

Civ. A. No. 76–1411.

United States District Court,
M. D. Pennsylvania.

Aug. 29, 1979.

Handler & Handler by Eric J. Wiener, Harrisburg, Pa., for plaintiff.

Metzger, Wickersham, Knauss & Erb by James F. Carl, Harrisburg, Pa., for defendant.

## MEMORANDUM

HERMAN, District Judge.

This case was consolidated for trial with *Universal Computer Systems, Inc., v. Medical Services Association of Pennsylvania t/a Pennsylvania Blue Shield,* 474 F.Supp. 472 (M.D.Pa.) Civil No. 77–868. On November 9, 1978, a jury rendered a verdict in the amount of $13,000 against Allegheny Airlines, Inc. and a verdict in like amount against Medical Services Association of Pennsylvania, trading as Pennsylvania Blue Shield. The Defendant in this action, Allegheny Airlines, Inc. filed motions for judgment notwithstanding the verdict, for a new trial, and to alter or amend the judgment. Subsequently Defendant Allegheny Airlines, Inc. filed a supplemental motion for judgment notwithstanding the verdict. These motions are now before the Court.

There are significant substantive prerequisites to the consideration of a motion for judgment notwithstanding the verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. A party must make a motion for a directed verdict and a party may not base a motion for judgment notwithstanding the verdict on a ground not advanced in his motion for a directed verdict. *Wall v. United States,* 592 F.2d 154 (3d Cir. 1979). In reviewing the motion for judgment notwithstanding the verdict the Court must view the evidence most favor-

ably to the party against whom the motion is made. *Denneny v. Siegel*, 407 F.2d 433 (3d Cir. 1969). We must determine whether as a matter of law the record is critically deficient of that minimum quantum of evidence from which a jury might afford relief. *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 760 (3d Cir. 1977). There exists a different standard for determining a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. A motion for a new trial may be granted on the ground that the verdict is against the clear weight of the evidence or when necessary to prevent a miscarriage of justice. Wright & Miller, Federal Practice and Procedure: Civil § 2505.

We will briefly recite the facts of this case construed in the light most favorable to the Plaintiff. In July of 1975, Blue Shield solicited bids for the lease of a computer. Pursuant to the bid solicitation, Plaintiff prepared a proposal, which was required by the solicitation to be received by Blue Shield no later than 12:00 noon on August 18, 1975. Plaintiff, through its President, Warren Wilson, contacted Joel Gebert, an employee of Blue Shield, and obtained Gebert's assurance that he would have the bid proposal picked up at the Allegheny Airlines ticket counter in Harrisburg on the morning of August 18, 1975 in time for the Blue Shield 12:00 noon deadline in Camp Hill. Pursuant to the Gebert promise, Plaintiff dispatched his bid proposal by Allegheny Airlines PDQ Service on August 18, 1975, at approximately 8:30 a.m. Wilson called Gebert again to give him the waybill number so that the proposal could be picked up per the agreement. Wilson was informed by Gebert that Gebert had changed his mind regarding his promise to pick up the bid proposal and would not do so. The package arrived at Harrisburg International Airport at approximately 9:30 a.m., August 18, 1975, after having been registered on the plane on the PDQ service for shipment at approximately 8:30 a.m. for Harrisburg. Wilson's son hand delivered the package to LaGuardia and received as a receipt a "small package air bill" with number 2651434. The air bill indicates flight 843, destination "MDT", referring to the Harrisburg International Airport at Middletown, Pennsylvania.

Upon learning of the Blue Cross refusal to pick up the bid proposal, Wilson obtained the number of the Allegheny manager in Harrisburg, a William N. Hanson. Hanson told Wilson that he would not release the proposal to anyone but Wilson or a direct employee of his or Ray Eichelberger of Blue Shield or possibly a direct employee of Blue Shield. Wilson attempted to convince Hanson that he was who he said he was in an attempt to convince Hanson to release the package to a courier. Wilson expressed to Hanson the gravity of the situation and the 12:00 noon deadline and explained that Blue Shield refused to pick up the bid because they considered it showing bias toward a bidder, and that he, Wilson, was the only employee of Universal. After Hanson refused to release the item to a courier, Wilson and another person in his office attempted to go over Hanson's head to get permission to release the item. The other person in Wilson's office obtained the name of one of the officers of Allegheny and as a result of a call to him and the officer's call to Hanson, Hanson released the proposal to a policeman at the airport who actually delivered the proposal. The proposal arrived after 12:00 noon and was rejected as a late bid by Defendant Blue Shield and returned unopened.

The motion for judgment notwithstanding the verdict raises a number of grounds. The Defendant claims that the applicable tariff provision provides that all claims must be made in writing within a period of nine months and nine days after acceptance of the shipment. The Defendant asserts that the applicable tariff provides that the Defendant shall not be liable for consequential or special damages whether or not the carrier had knowledge that such damages might be incurred, and that the applicable tariff provides that the Defendant shall not be liable for damage caused by the act or default of the consignor (Plaintiff) or the consignee (Medical Services Association of Pennsylvania, trading as Pennsylvania Blue

Shield). The motion further asserts that the evidence will not support a finding that Allegheny Airlines, Inc. was negligent or that any negligence or conduct on its part was a proximate cause of any injury or damages to the Plaintiff. In relation to these assertions the Defendant asserts that Plaintiff failed to establish that it in fact would have been awarded a contract for the 155 computer rental, that said computer was available to enable it to comply with a contract had a contract been awarded, or that the computer would have complied with the technical specifications and performance specifications set forth in the invitation for proposals. It is further asserted that Plaintiff failed to establish that if its bid proposal had been recommended by Pennsylvania Blue Shield that it would have been approved by the Federal Bureau of Health Insurance, or that if Plaintiff had received the initial award the final terms of the contract would have been approved by Pennsylvania Blue Shield.

The motion for a new trial asserts that the verdict was contrary to the law and evidence, against the weight of the evidence, excessive, ambiguous and inconsistent.

If the restrictions which are contained in Defendant's tariff are applicable and enforceable then the Defendant would be entitled to a judgment notwithstanding the verdict. This action by the Plaintiff involves a claim for damages against an interstate air carrier. The transportation by air of property in interstate commerce is subject to federal law, specifically the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq. An air carrier is required by 49 U.S.C. § 1373(a) to file its tariff with the Civil Aeronautics Board. It is standard operating procedure for the carriers to insert various self-serving disclaimers for liability in the tariffs which are filed, provisions which the customer becomes all too aware of after a claim arises.

The provisions at issue are contained in Allegheny's Airfreight Rules Tariff No. 1–B (Defendant Allegheny's Exhibit No. 1), Allegheny's Official Air Freight Small Package Tariff No. SPR–1, and Allegheny's Small Package Airbill. Rule 60(B)(1) of Airfreight Rules Tariff No. 1–B provides:

"(1) All claims, except for overcharges, must be made in writing to the originating or delivering carrier within a period of nine months and nine days after the date of acceptance of the shipment by the originating carrier. Claims for overcharges must be made in writing to the originating or delivering carrier within two years after the date of acceptance of the shipment by the originating carrier. In computing the time periods under this paragraph, the first day of the period shall be the day after acceptance of the shipment by the originating carrier."

Rule 30(B)(1) of the same rules provided:

"(d) The carrier shall not be liable for any consequential or special damages whether or not the carrier had knowledge that such damages might be incurred."

Rule 45(B) of Allegheny's Official Air Freight Small Package Tariff No. SPR–1 provides as follows:

"A shipment shall have a declared value of $50.00 unless a higher value (not to exceed $500.00) is declared on the airbill at the time of receipt of the shipment from the shipper. Shipments with a declared value in excess of $500.00 are not acceptable for transportation under this tariff."

On the back of Allegheny's Small Package Airbill are five printed paragraphs containing terms and conditions of the airbill. Paragraphs two and three provide as follows:

"2. It is mutually agreed that the shipment described herein is accepted on the validation date hereof in apparent good order (except as noted) for carriage as specified herein, subject to governing classifications and tariffs in effect as of the date hereof which are filed in accordance with law. Said classifications and tariffs are available for inspection by the parties hereto and are hereby incorporated into and made a part of this contract.

3. Declared Value is agreed and understood to be not more than the value

stated in the governing tariffs unless a higher value (not to exceed $500) is declared on this airbill at the time of receipt of the shipment from the Shipper. See governing tariffs for Carrier's LIMITATION OF LIABILITY."

Because the "Small Package Airbill", Plaintiff's Exhibit Number Three, is at issue, we should analyze the items which appeared on the front of that document. The named consignee was "Mr. Ray Eichelberger, Box 641, Penna. Blue Shield, Erford Road, Camp Hill, PA 17011." The shipper's name is filled in as "Universal Comp. Systems, 253 Riverside Ave., Westport, Conn." The airbill was executed by "S.D. Urso" on "8/18" at the time of "0735". From the facts as developed at the trial the time was a. m. rather than p. m. The flight is listed on the airbill as "Flight 843" with destination "MDT", for Middletown, Pennsylvania. Terms of payment are entered as "cash" and the total paid as appears from the airbill was a rate of $20.00 and $1.00 tax for a total of $21.00. There is stamped in blue on the front the legend "Allegheny Airlines, Aug. 1875, Laguardia N.Y. ATO." Several of the blanks are not filled in on the airbill. The date of issue is blank but from other information such as the execution and the blue stamp, the date is obviously August 18, 1975. Conspicuously absent from the airbill is any entry in the spaces labeled "Package Cont.", apparently for package contents; "Weight"; and especially the space marked "Declared Value _____ Not To Exceed $500."

The Defendant asserts several barriers to Plaintiff's recovery are contained in the above-cited provisions. It is Defendant's position that a written claim pursuant to Rule 60(B)(1) of Airfreight Rules Tariff No. 1-B had to have been submitted on or before May 28, 1976 within the nine month and nine day provision of the tariff as the

shipment occurred on August 18, 1975. The Plaintiff has not contested that the first written claim was made by Plaintiff by a letter dated June 1, 1976. Next the Defendant asserts that Rule 45(B) of Allegheny's Official Air Freight Small Package Tariff No. SPR–1 limits the value of the shipment to $50 because no declared value, up to a possible $500, was entered on the airbill.[1] And finally, although Defendant failed to cite the particular section, it apparently relies upon Rule 30(B)(1)(d) pertaining to lack of liability for consequential or special damages.

The Plaintiff does not argue that if the tariffs apply his claim was presented in a timely manner or could be worth more than $50. The Plaintiff indicates in his brief that the Defendant's have missed the point. Plaintiff states that its claim grows out of tort liability rather than contract, and that a distinction should be drawn between loss or damage to goods type limitations and a refusal to deliver a consignor's goods upon an oral request of the consignor resulting in consequential damages.

The Plaintiff relies in great measure upon *Nader v. Allegheny Airlines*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). In that case a common law tort action for fraudulent misrepresentation arising from an air carrier's failure to inform prospective passengers in advance of its deliberate overbooking practices was held to be consistent with the Federal Aviation Act, 49 U.S.C. §§ 1301 et seq. The Federal Aviation Act, under which the Civil Aeronautics Board was given the power to regulate air transportation, contains a "savings clause" at 49 U.S.C. § 1506 providing that nothing in the Federal Aviation Act abridges or alters the remedies at common law and that the provisions of the Act are in addition to such remedies. The common law action and the statute were held not to be absolutely in-

---

1. The Motion of Defendant Allegheny Airlines, Inc. to Alter or Amend the judgment requests that the judgment filed on November 9, 1978 be amended to allow the Plaintiff to only recover $50 plus interest and costs. Because the time barrier for the notice asserted by the Defendant

would be absolute, the motion seems inconsistent with the Defendant's general position in regard to the tariffs. Because we found the notice limit tariff applicable this motion will be denied.

consistent, there being no Civil Aeronautics Board requirement that air carriers engage in overbooking or not disclose that they do so, and any impact on rates that may result from the imposition of tort liability or from practices adopted by a carrier to avoid such liability was held to be merely incidental.

Although *Nader v. Allegheny Airlines, supra,* is instructive, it leaves unresolved one of the major problems in this case. In *Nader* the Supreme Court stated:

"Petitioner seeks damages for respondent's failure to disclose its overbooking practices. He makes no challenge to any provision in the tariff, and indeed there is no tariff provision or Board regulation applicable to disclosure practices. Petitioner also makes no challenge, comparable to those made in *Southwestern Sugar & Molasses Co. v. River Terminal Corp., supra* [360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959)] and *Lichten v. Eastern Airlines, Inc.,* 189 F.2d 939 (CA2 1951), to limitations on common-law damages imposed through exculpatory clauses included in a tariff."

▮ The attack in the instant case is not as to the validity of the tariffs, which should, under primary jurisdiction principles, be presented first to the Civil Aeronautics Board, but rather the Plaintiff asserts that the tariffs have no applicability to a claim such as this for conversion or wrongful interference with Plaintiff's property. See, *Nader v. Allegheny Airlines,* 426 U.S. 290, 303–304, 96 S.Ct. 1978, 48 L.Ed.2d 643, 654–655. We hold that the tariffs do apply. *Klicker v. Northwest Airlines, Inc.,* 563 F.2d 1310 (9th Cir. 1977) is distinguishable because in that case the airline refused to allow the shipper to declare a value for a dog being shipped, and therefore was not allowed to take advantage of the tariffs permitting carriers to partially limit their liability for injury, loss or destruction of baggage.

In this case the notice of claim was not timely presented to the carrier and is time barred. *Butler's Shoe Corp. v. Pan American World Airways, Inc.,* 514 F.2d 1283 (5th Cir. 1975); *Alco-Gravure v. American Airlines, Inc.,* 173 F.Supp. 752 (D.C.Md.1959). Even if the claim was not time barred, carriers may partially limit their liability on a "released valuation" basis whereby in exchange for a lower carriage rate, the shipper is deemed to release the carrier from liability beyond a stated amount. In this case, shipping on a carrier pursuant to the Small Package Airbill, the Plaintiff never could have had an expectation of recovering more than the $500 valuation limit on items shipped in this manner. Because it did not take the opportunity to pay for greater liability coverage by declaring a higher value the shipment had a $50 declared value pursuant to the tariff. The rates are set considering the risk assumed. *Blair v. Delta Air Lines, Inc.,* 344 F.Supp. 360 (S.D.Fla. 1972), aff'd 477 F.2d 564 (5th Cir. 1973). It would not have been unreasonable to expect Plaintiff to pay more for protection in excess of $20,000 or even for Plaintiff to have paid for a seat for an agent on the airline to insure that something of the contingent value of the bid proposal would arrive as planned. The $50 limitation would apply to all liability including any claim for consequential or special damages. *Bendersky v. Trans World Airlines, Inc.,* 10 AVI 18, 123 (Memorandum, September 27, 1968, E.D. Pa., per Kirkpatrick, J.).

▮ In its motion for judgment notwithstanding the verdict the Defendant also raised a tariff provision which provides that the carrier will not be liable for the act or default of the consignor or consignee. This matter was not briefed by the Defendant and in any event we do not find the defense applicable in this situation where the claimed fault is that of the carrier's agent refusing to release the consigned item to a person other than the designated consignee upon oral instructions from the consignor.

▮ Were the tariffs not applicable to this situation we find the Defendant's remaining arguments concerning tort liability unconvincing. The jury in this case determined from the facts that the Defendant wrongfully interfered with the Plaintiff's property. Although we did not give an in depth charge on the nature of the tort, the

parties did not object to our description of it at that time. The jury considered the agent's actions to be a wrongful interference with the Plaintiff's right to possession of its property and our detailed examination of the evidence and elements of the tort fails to convince us that the verdict should be disturbed if the tariffs were found to be inapplicable.

The tort involved in this case is known as conversion and according to Prosser, "almost defies definition." W. Prosser, Law of Torts § 15, at 79 (4th ed. 1971). It is defined in the Restatement (Second) of Torts § 222A as follows:

§ 222A. What Constitutes Conversion

(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

(2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

See, Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721 (1964); Welded Tube Co. of America v. Phoenix Steel Corp., 512 F.2d 342 (3d Cir. 1975); Cenna v. United States, 402 F.2d 168 (3d Cir. 1968); Stern v. Bricklin, 455 F.Supp. 346 (E.D.Pa.1978).

The comments following this section indicate that conversion has been limited in the courts to those serious, major and important interferences with the right to control the chattel which justify requiring the defendant to pay its full value. Not only the conduct of the defendant, but also the consequences of the conduct are to be taken into account, and no one fact is always predominant in determining the seriousness of the interference. The question is described as being one of degree.

Section 223 of the Restatement Second of Torts, lists several ways of committing conversion which may include § 223(g) "refusing to surrender a chattel as stated in §§ 237–241."

In this case the testimony developed that Allegheny's agent at the Middletown airport refused to release the item consigned from approximately 11:00 a. m. to 12:00 noon, and that the item was due in Camp Hill at 12:00 noon. Whatever value the item possessed was destroyed during that hour's delay. Testimony further developed that the agent was informed of the emergency nature of the matter and the Plaintiff's president suggested that the Allegheny agent obtain his phone number through information and confirm that he was calling for Universal Computer, Inc. This the agent refused to do. The Defendant's agent was informed that a person to serve as a courier from the airport had been obtained. The agent insisted on written authorization from the consignor, which would have been impossible to accomplish in a timely manner under the circumstances.

The particular tortious conversion involved is described in the Restatement Second of Torts, § 237 as conversion by demand and refusal. See, Norriton East Realty Corporation v. Central-Penn National Bank, 435 Pa. 57, 254 A.2d 637 (1969); Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721 (1964); Druckenmiller v. Kuzenski, 181 Pa.Super. 246, 124 A.2d 141 (1956). Basically it provides that "[o]ne in possession of a chattel as bailee or otherwise who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession, is subject to liability for its conversion. A demand by one entitled to immediate possession and a refusal are necessary elements of the tort, and a person in possession of a

chattel as bailee may be liable in spite of the fact that he obtained possession of the chattel in a lawful manner. Restatement Second of Torts, § 237, Comment. However, there is a qualified right of refusal upon unreasonable demand, that is "[o]ne in possession of a chattel does not become a converter by making a qualified refusal immediately to surrender the chattel when the circumstances are such that the demand for immediate surrender is unreasonable." Restatement Second of Torts, § 238. Comment (d) to the Restatement Second of Torts, § 238 indicates that if a bailee has established reasonable regulations for the conduct of his business as a bailee, a qualified refusal to surrender a chattel because the demandant has failed to comply with such regulations does not make the bailee liable. The Defendant in this case never was able to indicate a regulation requiring what the agent demanded. When the agent's superior in Pittsburgh contacted him, the agent did release the package without written authority from the consignor. To his credit, the only apparent motive of the agent seemed to be to insure that the package was not misdelivered.

Comment (a) to the Restatement Second of Torts, § 237 also indicates that a conversion must be so serious an interference with the right of another to control the chattel, as to make it just to require the actor to pay its full value, and there may be trivial and unimportant detentions of chattels which are not so serious as to amount to a conversion. Further § 239 of the Restatement Second of Torts, provides that "[o]ne in possession of a chattel does not become a converter by making a qualified refusal to surrender it to a claimant as to whose identity he is in reasonable doubt, for the purpose of a reasonable opportunity to identify him." Generally the person in possession will be liable for even an innocent delivery to the wrong person, and it is therefore necessary for his own protection that he have a reasonable opportunity to determine whether the person demanding the chattel is the one to whom he is obligated to deliver it. Comment (a) to Restatement Second of Torts, § 239. Comment (c) to the same

section provides that the privilege extends only for "the length of time reasonably necessary to make reasonable inquiry as to the identity of the claimant," and that will depend upon many factors including the information in fact obtained, the availability of further information or the difficulty of obtaining it, and the point at which it becomes clear that all readily available sources of information have been exhausted.

There is a further limitation on the qualified refusal contained in Restatement Second of Torts, § 241 which provides that the refusal must be made in good faith based upon the defense of unreasonable demand, refusal in order to identify the claimant, or refusal to surrender where the claim is doubtful (Restatement Second of Torts, §§ 238, 239 and 240) *and* such reason is required to be communicated to the claimant at the time, unless the circumstances of the case justify the failure to do so.

The intent required for the tort is clarified in Section 244 of the Restatement Second of Torts, and the comments thereto. That section, on the "effect of mistake" provides that the actor is not relieved of liability to another for conversion by his belief, because of a mistake of law or fact not induced by the other, that he is somehow privileged to act. However, in the absence of any circumstances indicating misapplication or an intent to exercise dominion adverse to the owner, a demand and refusal is an essential element of an action for conversion. *Norriton East Realty Corporation v. Central-Penn National Bank*, 435 Pa. 57, 254 A.2d 637 (1969).

The question of damages is a complex one because of the nature of the property involved. *See, Cenna v. United States*, 402 F.2d 168 (3d Cir. 1968); *MacKay v. Benjamin Franklin Realty & Holding Co.*, 288 Pa. 207, 135 A. 613 (1927). The measure of damage for a conversion is generally the plaintiff's loss which is figured as the market value at the time and place of conversion plus interest. *Knuth v. Erie-Crawford Dairy Cooperative Association*, 463 F.2d 470 (3d Cir. 1972), *cert. denied*, 410 U.S. 913, 93

S.Ct. 966, 35 L.Ed.2d 278; *Diesel v. Caputo,* 244 Pa.Super. 195, 204, 366 A.2d 1259 (1976). A claim for damages must be supported by a reasonable basis for calculation and a mere guess or speculation is not enough, so that one who establishes a conversion by the defendant but has not proved any damages must be limited to a vindication of his possession by an award of nominal damages. *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 197 A.2d 721 (1964). It has been held that where there was an innocent conversion of personalty, the court properly refused to submit to the jury any claim for consequential damages. *Plack v. Baumer,* 121 F.2d 676 (3d Cir. 1941); *Babich & Stotler, Inc. v. John Deere Industrial Equipment Co.,* 339 F.Supp. 1381 (W.D.Pa. 1972); *Wolfe v. Pennsylvania Co.,* 322 Pa. 344, 185 A. 292 (1936); 37 P.L.E. Trespass, § 111.

In this case the property in question was a bid proposal which constituted an offer to make a contract. The Restatement (Second) of Torts § 242 provides that where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights. Although the bid proposal roughly fits into this category, it represents rights which had not yet come to fruition, and which might have had the proposal been timely delivered.

The Defendant objected to the amount and certainty but never objected to the proper measure of damages to be applied by the Court. We charged the jury as follows:

"The fact that the plaintiff testified that he lost a great sum of money as a result of this, you will have to consider that along with all of the evidence as to whether, if his bid had gotten in, whether he would have gotten the contract or not.

The testimony was that low bidder didn't automatically get the contract, even if his bid had been low and even if it had no restrictions on it, the defendant claims that there was a restriction on that bid in any event, that he said time permitting or something like that.

But in determining what the damages are, of course the plaintiff has the burden of proving that if his bid proposal had been timely received that he would have been awarded the contract and would have been able to perform. And he has to further show that the damages are not speculative, you can't guess what his damages are. (N.T. 251–252)

.    .    .    .    .

There is another correct statement and it is a repetition, it seems to me, there can be no recovery of damage whose existence rests solely on speculation and where it is uncertain whether the plaintiff suffered any damage." (N.T. 252)

We discussed the issue of damages in our memorandum in the companion case of *Universal Computer Systems, Inc. v. Medical Services Association t/a Pennsylvania Blue Shield,* 474 F.Supp. 472 (M.D.Pa.). We pointed out that Plaintiff presented testimony to the effect that had its bid been timely received it was the lowest and there would have been no reason for its disqualification. The Plaintiff also presented testimony to the effect that it had a computer which would have met the specifications.

Plaintiff's president testified that he expected a $21,000 profit on this particular contract if he obtained it, but that the standard commission would be three halves of $17,500 or a total of $26,500. We cannot say that a $13,000 verdict against Allegheny Airlines, Inc., if not limited by the tariff, which could have been at least $21,000 under the evidence, would be excessive or that it was unsupported merely because it was considerably less than the testimony presented by the Plaintiff. Nor was the verdict excessive because when combined with the other separate verdict the two total $26,000. As we stated in our memorandum in the *Blue Shield* case, accepting the loss of the contract as the measure of damages, we believe the fact of damages was proved with reasonable certainty. The amount found was within the jury's discretion and therefore the motion for a new trial on this basis should be denied.