731 F.2d 1113
 FIRST PENNSYLVANIA BANK, N.A., Appellant,
v.
EASTERN AIRLINES, INCORPORATED, Appellee.
 No. 83-1441.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 26, 1984.
Decided April 10, 1984.
 
 1
 Fred T. Magaziner (argued), Dechert Price & Rhoads, Philadelphia, Pa., for appellant.
 
 
 2
 Paul J. Bankes, Jr. (argued) Ownes, Whiteman & Bankes, Philadelphia, Pa., for appellee.
 
 
 3
 Before GIBBONS and BECKER, Circuit Judges and DUMBAULD, Senior District Judge.*
 
 OPINION OF THE COURT
 
 4
 DUMBAULD, Senior District Judge.
 
 
 5
 This case involves determination of some of the legal consequences of deregulation[1] of common carriers with respect to their liability for lost shipments. Specifically, we must define the scope of a common carrier's authority to limit its liability for the loss of a package carried by its low-cost express service. Appellant contends that after deregulation of air carriers and abolition of the authority of the Civil Aeronautics Board (CAB) over rates and tariffs, the question is to be determined by state law (that of the Commonwealth of Pennsylvania in the case at bar) and asserts that under Pennsylvania law a decision in appellant's favor is mandated. The district court, however, held that federal common law rules relating to rates based on value of the property shipped survive under deregulation, and rendered judgment for the shipper in the amount of $500, being the amount calculated in accordance with the released value specified in the carrier's shipping documents and tariffs. We affirm.
 
 I. Facts
 
 6
 Counsel commendably expedited trial of this case by stipulating most of the facts. There is little if any disagreement as to the facts of the case, and in any event the trial court's findings cannot be challenged as "clearly erroneous." Fed.R.Civ.P. 52(a). A brief summary will suffice as background for the legal questions which are significant in this litigation.
 
 
 7
 Appellant, a prominent Philadelphia bank, has occasion for prompt transmission of checks in huge sums from its Virgin Islands office to Philadelphia. The sooner the checks reach the bank in Philadelphia the sooner the large sums of money involved can be invested profitably. In the past an employee of the bank traveled from St. Thomas as a courier, bringing the checks in a pouch (A-208). In search of a speedier method, the bank's Caribbean manager John Gimenez telephoned Eastern Airlines, and in due course had an interview with Ken Burch of Eastern. Burch explained a service offered under the name of SPRINT which required less time than than the passenger travel by courier which the bank was then using. Small packages could conveniently be delivered at the airline office without advance reservation and the shipment would travel on the next flight for the destination city.
 
 
 8
 However, SPRINT service is available only for shipments having a value of $500 or less. This was made clear to Mr. Gimenez by Mr. Burch. When Mr. Gimenez mentioned that the checks to be transported were worth millions of dollars, consisting in large part of U.S. Treasury checks deposited with First Pennsylvania by the Government of the Virgin Islands, Mr. Burch responded that Eastern had not ever lost any SPRINT packages (A-153-54).
 
 
 9
 For whatever significance they may have in our subsequent legal analysis, there is no doubt as to the existence of the following facts:
 
 
 10
 (1) Appellant was informed by Eastern and knew at the time of every shipment that SPRINT service was available only for shipments valued at $500 or less.
 
 
 11
 (2) On every shipment of checks a declared value of $500 was written on the air bill, to appellant's knowledge, and appellant continued to use SPRINT service for 147 shipments between January 31, 1978, through December 29, 1980. On January 17, 1981, the "fatal" shipment which was lost and never found by Eastern was made in accordance with the same procedures established when appellant first used the SPRINT service (A-292). The shipment of January 17, 1981, contained 574 checks, the largest of which was a Treasury check for $3,787,767.00. A replacement check for this amount was received by appellant on March 4, 1981. There were 573 checks totaling $364,313.45. Appellant ultimately recovered all but $12,932.12 of the funds represented by these checks.
 
 
 12
 (3) At all times when appellant used SPRINT service there was a published tariff provision in effect providing for $500 maximum liability on the part of Eastern. There was also in effect a published tariff provision relating to air freight service, permitting higher valuation and specifying a higher rate for the transportation. When appellant first used Eastern's SPRINT service the tariffs were filed in accordance with law with the CAB. After deregulation, the tariffs were publicly available in a compendium entitled "Official Airline Freight Rate Tariff Book." Appellant could at any time have consulted all of Eastern's tariffs and familiarized itself with the rates therein specified had it seen fit to do so.
 
 
 13
 (4) At no time did Eastern inform appellant of the existence of its alternative air freight service permitting higher valuation at a higher rate (A-105, 141, 146). Nor did Eastern ever show appellant its tariffs or suggest that it might be advisable for appellant to consult the tariff provisions to become aware of the options available for transporting valuable items (A-154).
 
 
 14
 Summarizing, it is beyond dispute that the bank by signing the shipping papers knew that the carrier's tariffs purported to limit liability to the $500 released value; and it is equally beyond dispute that no employee of the carrier personally disclosed to the bank the availability of alternative higher rates carrying greater liability.
 
 
 15
 Under these circumstances, what are the respective rights of the parties?
 
 
 16
 II. The Federal Common Law on Limitations of Common Carrier
 
 Liability
 
 17
 We hold that federal law, rather than Pennsylvania law, governs the enforceability of the released value clause. An understanding of the law regarding limitation of liability by common carriers and the law regarding released value rates must begin with the cases involving rail carriers, at and after enactment of the Interstate Commerce Act in 1887.
 
 
 18
 Under the common law of common carriers as applied by federal and state courts, it was generally held that public policy forbade contracts of carriage where the carrier sought to exculpate itself from liability for its own negligence. However, a sharp distinction was drawn between such exculpatory provisions and provisions which merely limited liability to the agreed value of the property shipped when the amount of the rate depended upon the value of the shipment. Here the limitation of the carrier's liability was a consequence of the calculation of the transportation charge based upon the agreed value, rather than an exculpation from negligence. In a suit against the carrier in such a case, the carrier's negligence was assumed to exist, rather than avoided; the limitation of the shipper's damages to the agreed value was merely a consequence of the assumption that the agreed upon value was the true value of the property transported. Without the released value agreement, the carrier's liability would be limited by common law principles to the actual true value of the property. The agreed upon value merely constituted an estoppel against the unfairness of asserting a larger amount as the true value when the carrier was sued for damages in spite of the fact that a smaller value had been used to calculate the rate. The legal validity of an agreed value contract merely enabled the carrier's rate to be reasonably measured in accordance with the risk to which it was exposed by reason of the value of the property transported.
 
 
 19
 An early leading case establishing this distinction is Hart v. Pennsylvania R.R., 112 U.S. 331, 337-38, 5 S.Ct. 151, 153-55, 28 L.Ed. 717 (1884). Valuable race horses were shipped as livestock. The court upheld limitation of recovery to $1200, as specified in the contract of carriage, saying:
 
 
 20
 There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum than that claimed after a loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier.
 
 
 21
 112 U.S. at 340, 5 S.Ct. at 155. The court cited Lord Mansfield in Gibbon v. Paynton, 4 Burr. 2209, 2300, for the rule that the carrier's "reward ought to be proportionable to the risque." 112 U.S. at 341, 5 S.Ct. at 156. The Court summarized its decision as holding
 
 
 22
 that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations.
 
 
 23
 Id. at 343, 5 S.Ct. at 157.
 
 
 24
 This rationale has persisted throughout various periods of regulatory legislation. Following the enactment of the Interstate Commerce Act of February 4, 1887, 24 Stat. 379, and the Hepburn Act of June 29, 1906, 34 Stat. 584, section 20 of which contained the provision known as the Carmack amendment, the same distinction was observed. See Adams Express Co. v. Croninger, 226 U.S. 491, 509-10, 33 S.Ct. 148, 153-54, 57 L.Ed. 314 (1913). In this case the Supreme Court made it clear that Congress had occupied the field and superseded the diversity of state regulation on the subject matter. Id. at 504-506, 33 S.Ct. at 151-152.[2] To the same effect is Kansas City Southern Ry. Co. v. Carl, 227 U.S. 639, 650-53, 33 S.Ct. 391, 394-95, 57 L.Ed. 683 (1913).[3] In that case the Court emphasized another important principle of rate regulation that "The shipper's knowledge of the lawful rate is conclusively presumed" and he is thus charged with constructive knowledge of the contents of duly published tariffs. Id. 227 U.S. at 653, 33 S.Ct. at 395.
 
 
 25
 A recent case setting forth the same rule is New York, N.H. & H.R.R. v. Nothnagle, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953), where the Supreme Court held that the carrier could not claim the benefit of the Carmack amendment with respect to redcap service when no value had been agreed to in writing by the passenger whose baggage had been lost; and indeed the tariff excluded property valued at over $500. The Court pointed out that "only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." Id. at 135, 73 S.Ct. at 990. There must be a bona fide alternative enabling the shipper to declare a higher valuation upon paying a higher rate, in order for the carrier to limit its liability to the released value at the lower rate. Union Pacific R.R. Co. v. Burke, 255 U.S. 317, 323, 41 S.Ct. 283, 285, 65 L.Ed. 656 (1921). The shipper is bound "only if he has notice of the rate structure and is given the opportunity to pay the higher rate in order to obtain greater protection." Klicker v. Northwest Air Lines, 563 F.2d 1310, 1315 (9th Cir.1977).
 
 
 26
 The same principle was carried over into federal common law when air carriers were subjected to regulation.[4] The regulatory statutes did not contain language equivalent to the Carmack amendment.[5] However, both the Civil Aeronautics Act and the Federal Aviation Act contained a savings provision preserving "the remedies now existing at common law or by statute ...." 49 U.S.C. Sec. 1506 (1976). In accordance with section 1506, the general policy of common carrier liability and duty to maintain reasonable and non-discriminatory rates were applied by the federal courts so as to recognize the doctrine developed under railroad regulation. That section 1506 "expressly incorporated the entire federal common law applicable to carriers" was declared in Klicker v. Northwest Airlines, Inc., 563 F.2d 1310, 1314 (9th Cir.1977).
 
 
 27
 The leading case in this circuit is Universal Computer Systems v. Allegheny Airlines, 479 F.Supp. 639, 641-43 (M.D.Pa.1979), aff'd mem., 622 F.2d 579 (3d Cir.1980). Plaintiff there shipped a small parcel containing a bid for supplying a computer to Blue Cross at Camp Hill. The deadline for bids was 12:00 noon. An employee of Blue Shield had promised to pick up the package at the airport, but changed his mind, thinking such a step might be thought to show favoritism to a particular bidder. Plaintiff then sought to arrange for a courier to pick up and deliver the bid, but Allegheny refused to deliver the package to anyone but the original consignee. By the time plaintiff convinced higher officers of Allegheny to release the package to a policeman who delivered it to Blue Cross, the noon deadline had passed and plaintiff's bid was rejected and returned unopened.
 
 
 28
 Plaintiff's lawsuit in that case was a common-law tort claim for conversion or wrongful interference with plaintiff's property. Plaintiff argued that such an action could be maintained under Nader v. Allegheny Airlines, 426 U.S. 290, 298-300, 96 S.Ct. 1978, 1984-1985, 48 L.Ed.2d 643 (1976), and that the tariff provisions relied on by the carrier were inapplicable. The court held "that the tariffs do apply." 479 F.Supp. at 643. Hence judgment n.o.v. was rendered for the carrier.
 
 
 29
 With relevance to the case at bar, the court expressly upheld limitation of liability upon a released valuation basis, and stated that "the Plaintiff never could have had an expectation of recovering more than the $500 valuation limit on items shipped in this manner [pursuant to the terms of the Small Package Airbill]. Because it did not take the opportunity to pay for greater liability coverage by declaring a higher value the shipment had a $50 declared value pursuant to the tariff. The rates are set considering the risk assumed .... The $50 limitation would apply to all liability including any claim for consequential or special damages." Id. at 643.
 
 
 30
 The tariff and airbill provisions relating to released value upheld in Allegheny are substantially identical with those in the case at bar.[6]
 
 
 31
 Eastern's small package tariff applicable to the lost shipment (A-248) and Allegheny's Rule 45(B) [see 479 F.Supp. at 641] are identical in haec verba: "A shipment shall have a declared value of $50 unless a higher value (not to exceed $500.00) is declared on the airbill at the time of receipt of the shipment from the shipper. Shipments with a declared value in excess of $500.00 are not acceptable for transportation under this tariff."
 
 
 32
 Paragraphs 2 and 3 of Eastern's airbill (A-246, more legibly at A-265) and of Allegheny's airbill (see 479 F.Supp. at 641-42) are virtually identical: Eastern's reads:
 
 
 33
 2. It is mutually agreed that the goods described herein are accepted on the validation date hereof in apparent good order except as noted for carriage as specified herein subject to the governing classifications and tariffs of each of the transporting carriers over their respective segments of the routing in effect on the dates of transportation and which are filed in accordance with law. Said classifications and tariffs are available for inspection by the parties hereto and are hereby incorporated into and made a part of this contract.
 
 
 34
 3. Declared value is agreed and understood to be not more than the value stated in the governing tariffs for each pound on which charges are assessed unless a higher value not exceeding $500 is declared herein and applicable charges paid thereon.
 
 Allegheny's reads:
 
 35
 2. It is mutually agreed that the shipment described herein is accepted on the validation date hereof in apparent good order (except as noted) for carriage as specified herein, subject to governing classifications and tariffs in effect as of the date hereof which are filed in accordance with law. Said classifications and tariffs are available for inspection by the parties hereto and are hereby incorporated into and made a part of this contract.
 
 
 36
 3. Declared value is agreed and understood to be not more than the value stated in the governing tariffs unless a higher value (not to exceed $500) is declared on the airbill at the time of receipt of the shipment from the Shipper. See governing tariffs for Carrier's LIMITATION OF LIABILITY.
 
 
 37
 In view of this identity in the crucial provisions of the basic documents governing the transactions, it would seem that Allegheny is a strong precedent governing the case at bar and dictating affirmance of the judgment appealed from.[7]
 
 
 38
 It thus seems clear that federal common law, not Pennsylvania law, governs the case at bar, and requires a result favorable to appellee, unless the deregulation statutes undermined and abrogated the settled law regarding agreed valuation shipments.
 
 III. The Effect of Deregulation
 
 39
 We turn now to a comparison of the regulatory schemata before and after the deregulation legislation.
 
 
 40
 One major aspect of regulation, but one which is not pertinent to the case at bar, is the erection of barriers to entry. Before a carrier may start in business, it must obtain a certificate from the regulatory body that the new service proposed is required by public convenience and necessity. (Sec. 401 of 1938 Act, 52 Stat. 987). This requirement often necessitated a high degree of proof on the part of the applicant that existing carriers are furnishing inadequate service. In the case of the airlines, moreover, because aviation was regarded as an infant industry but essential for national defense, the law applicable to the CAB[8] permitted it to be legitimately more protective of the carriers it was set up to regulate[9] than in the case of other regulatory bodies such as the Interstate Commerce Commission (I.C.C.). The declaration of policy in the deregulation Act of 1978 encouraged new entry and favored reliance on competition to provide efficiency, innovation, and low rates. (Sec. 102(a), 92 Stat. 1706-07).
 
 
 41
 The major aspect of regulation pertinent to the case at bar is that dealing with rates. Carriers were required to file published tariffs with the CAB and obliged to collect the rates set forth in the tariffs. Sec. 403 of the 1938 Act, 52 Stat. 992; [1958 Act, 72 Stat. 758-59].[10] To prevent sudden changes of rates for favored shippers, thirty days notice of proposed rate changes was required, except that the regulatory body could permit short-notice changes in the public interest. Sec. 403(c) of 1938 Act, 52 Stat. 993; [1958 Act, 72 Stat. 759].
 
 
 42
 Another fundamental requirement of regulation is that rates must be reasonable[11] and non-discriminatory.[12]
 
 
 43
 To ensure observance of these standards, the regulatory agency may, upon complaint or upon its own initiative, institute investigation and suspension proceedings, and if it finds the rates unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, may prescribe the lawful rate thereafter to be in effect.[13]
 
 
 44
 As a consequence of the regulatory agency's authority over rates, the doctrine of "primary jurisdiction" has long been observed.[14] This means that a shipper complaining that a carrier's rate, rule, or practice is unreasonable or discriminatory must exhaust the administrative jurisdiction over the subject matter before seeking a judicial determination of the question.
 
 
 45
 What changes in this scheme of regulation, pertinent to the case at bar, were wrought by the recent airline deregulation legislation?
 
 
 46
 The amended declaration of policy, encouraging reliance upon competition and market forces, has already been mentioned, as well as the accompanying relaxation of the certification requirements for new service, which do not affect the case at bar.
 
 
 47
 With respect to rates, a succinct statement of the effect of deregulation would be that the CAB was shorn of its powers to pass upon the reasonableness of rates for interstate air transportation of property, and to prescribe future rates to replace those found to be unreasonable. Abolition of these powers of the CAB simply abrogated pro tanto the doctrine of "primary jurisdiction" with respect to such rates. The courts were thus left free to proceed without circuity to apply directly the familiar federal common law rules relating to the subject matter of released value rates.
 
 
 48
 The two major changes in the regulatory scheme which are pertinent to the case at bar are the elimination of the obligation of an air carrier of property to file tariffs with the Board and to adhere to them;[15] and the elimination of the Board's power to determine the reasonableness vel non of an air carrier's rates, rules, and practices and its power to prescribe rates, rules and practices for the future.[16]
 
 
 49
 The first of these changes had no practical effect insofar as the case at bar is concerned. As the Board foresaw, carriers in their own economic interest can be relied upon to inform shippers regarding their charges for service.[17] Eastern in fact continued to publish tariffs which were available to appellant (though no longer filed with the CAB).
 
 
 50
 The second change merely eliminated the need to exhaust administrative remedies before resorting to the judicial remedies at common law which were preserved by the regulatory statutes governing air transportation.[18]
 
 
 51
 Deregulation of air carriers began when by the Act of November 1, 1977, 91 Stat. 1278, 1284, there was tacked onto a bill relating to the types of risks which the Secretary of Transportation may insure in connection with aircraft operation necessary to carry out American foreign policy, a series of provisions substantially deregulating air transportation of property. These related principally to all-cargo service, and a new section 418, 49 U.S.C. Sec. 1388 (Supp. V 1981), was added to the Federal Aviation Act of 1958, virtually granting any citizen of the United States the opportunity to obtain a certificate for such service without restrictions as to rates or routes. Section 418(c) exempted holders of such section 418 certificates "from the requirements of section 401(a) of this Act [relating to public convenience and necessity], and any other section of this Act which the Board by rule determines appropriate, and any rule, regulation, or procedure issued pursuant to any such section." 91 Stat. at 1285; see 49 U.S.C. Sec. 1388(c) (Supp. V 1981).
 
 
 52
 Moreover, section 1002(d), 49 U.S.C. Sec. 1482(d) (Supp. V 1981), was amended by substituting "interstate air transportation of persons" for "interstate ... air transportation" generally, in the subsection empowering the CAB to prescribe rates for the future when it finds challenged rates or practices to be "unjust or unreasonable." 91 Stat. at 1286; see 49 U.S.C. Sec. 1482(d)(1) (Supp. V 1981).
 
 
 53
 This amendment abolished the Board's power to eliminate unreasonable rates, rules, or practices for the interstate domestic transportation of property (either by all-cargo planes or in combination with passenger service).
 
 
 54
 A new section 1002(d)(3) was added, providing with respect to any unjustly discriminatory, unduly preferential, unduly prejudicial, or predatory rate, classification, rule, regulation, or practice, that the Board was empowered to "alter such rate, charge, classification, rule, regulation, or practice to the extent necessary to correct such discrimination, preference, prejudice, or predatory practice." 91 Stat. at 1287; 49 U.S.C. Sec. 1482(d)(3) (Supp. V 1981). It was also provided that the Board could not suspend rates unless it had power to prescribe the lawful rate. 91 Stat. at 1287.
 
 
 55
 The Airline Deregulation Act of October 24, 1978, 92 Stat. 1705, contemplated complete abolition of the Civil Aeronautics Board by January 1, 1985, and provided that with respect to transportation of persons sections 403, 404, and 1002(d)(1), (d)(2) and (e), inter alia, should cease to be in effect on January 1, 1983, 92 Stat. at 1745; 49 U.S.C. Sec. 1551 (Supp. V 1981). It also amended section 416(b) so as to empower the Board to "exempt from the requirements of this title [relating to economic regulation] or any provision thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder, any person or class of persons if it finds that the exemption is consistent with the public interest." 92 Stat. at 1731-32.[19]
 
 
 56
 The Board on November 8, 1978, issued regulations exempting all property carriers from the requirements of Section 403 [tariffs] and Section 404(a) [reasonable rates, rules, and practices]. 43 Fed.Reg. 53637 (1978). Section 418(c), as seen above, authorized this exemption for all-cargo carriers. But, as the Board observed, "It would be anomalous to create different liability systems depending on whether cargo is carried on an all-cargo plane or on a combination plane." Liability and Claim Rules and Practices, 77 C.A.B. 763, 765 (July 21, 1978). In that proceeding the Board expressed its "expectation that the courts will apply common law rules to the carriers' liability and claims practices." Id. at 766, citing Klicker v. Northwest Airlines, Inc., 563 F.2d 1310 (9th Cir.1977).
 
 
 57
 Hence it exempted all property carriers from the tariff requirements of Section 403, relying upon the "hardship" exemption provision in Section 416(b), 49 U.S.C. Sec. 1386(b) (Supp. V 1981), as authority for such action.[20] In National Small Shipments Traffic Conference v. C.A.B., 618 F.2d 819, 822 n. 2, 823-24 n. 5 (D.C.Cir.1980), the court upheld the Board's action. The Act of October 24, 1978 had so broadened Section 416(b) as to authorize exemption upon finding merely "that the exemption is consistent with the public interest." 92 Stat. at 1731-32.
 
 
 58
 The legal sequelae of deregulation therefore had no impact upon the applicability of the federal common law's released value doctrine. Prior to deregulation the question whether a particular released value tariff provision was reasonable vel non might have had to be determined in the first instance by the Board under the "primary jurisdiction" doctrine in view of the carrier's obligation under Section 404(a) and the Board's powers under Section 1002(d). Trailways of New England v. C.A.B., 412 F.2d 926, 931 (1st Cir.1969); but see Klicker, 563 F.2d at 1313. Deregulation deprived the C.A.B. of power to determine questions of reasonableness of tariff provisions.[21] Hence, in effect it merely did away with the applicability of the doctrine of primary jurisdiction. After deregulation, the validity of the agreed value provision in Eastern's voluntarily published tariff, available in the Official Freight Rate Tariff Book, became a purely judicial question for determination by application of the federal common law patterned upon the policy of the Carmack amendment.
 
 IV. The Merits
 
 59
 It will be remembered that under the statutory law existing at the time appellant's first shipment was made on January 31, 1978, the tariff provisions and shipping documents constituted constructive notice to appellant; and that all subsequent shipments were made in accordance with the same procedure as established at the time of the first shipment.
 
 
 60
 As sophisticated men of affairs, appellant's officers knew that there was substantial risk arising from the discrepancy when the shipments had an actual value of millions of dollars and the carrier disclaimed in writing any liability in excess of $500. They made a business judgment when they decided not to explore the possibility of obtaining greater protection from the airline at a higher rate, or even of taking out a policy themselves with an insurance company to cover their exposure. Having made their bed they must lie in it. We are not at liberty to "second guess" their cost-benefit analysis.
 
 V. Conclusion
 
 61
 In sum, we reach the following conclusions: (1) this case is governed by federal common law rather than by state law; (2) under federal common law, the authority of a common carrier to limit its liability for the loss of goods in its care is governed by the "released value doctrine," under which a carrier may limit its liability to the agreed value of the goods, provided that the shipper has the option of obtaining coverage for the full value of its goods, is made aware of that option, and knowingly chooses to pay a lower price for lesser coverage; (3) deregulation has not changed either the applicability of federal law or its substantive content; and (4) because of the fact that the first shipment by appellant was made before the deregulation, the fact that appellee's rate schedule was on file within the C.A.B. gave appellant constructive notice of the schedules referenced in the SPRINT contract, thus bringing appellee's limitation of liability within the released value doctrine. We express no opinion as to whether the current practice of referencing schedules located in the "Official Airline Freight Rate Tariff Book" would be sufficient to inform a shipper of the availability of alternative services providing for full loss liability coverage.
 
 
 62
 The judgment of the district court will be affirmed.
 
 
 
 *
 Hon. Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 See North American Van Lines, Inc. v. I.C.C., 666 F.2d 1087, 1089 (7th Cir.1981)
 
 
 [2]
 In Pennsylvania R.R. v. Hughes, 191 U.S. 477, 488, 24 S.Ct. 132, 135, 48 L.Ed. 268 (1903), the Court held that in the absence of federal legislation dealing with contracts limiting liability to stipulated valuations, states were free to enforce their own regulations upon the subject. Federal courts continued to apply Hart. The Carmack amendment remedied this conflicting and confusing situation
 
 
 [3]
 See also Pierce v. Wells, Fargo & Co., 236 U.S. 278, 283, 35 S.Ct. 351, 353, 59 L.Ed. 576 (1915); cf. Boston & Maine R.R. v. Piper, 246 U.S. 439, 443-45, 38 S.Ct. 354, 355, 62 L.Ed. 820 (1918); Union Pacific R.R. Co. v. Burke, 255 U.S. 317, 322-23, 41 S.Ct. 283, 284-85, 65 L.Ed. 656 (1921)
 
 
 [4]
 The Civil Aeronautics Act of June 23, 1938, 52 Stat. 973, established a regulatory pattern for air carriers similar to that in force for railroads. This was followed by the Federal Aviation Act of August 23, 1958, 72 Stat. 731. Both acts contained a provision (now found in 49 U.S.C. Sec. 1506 (1976)) preserving existing common law remedies. This provision preserved the federal common law hereinbefore discussed relating to agreed valuation tariffs
 
 
 [5]
 The majority in Lichten v. Eastern Airlines, 189 F.2d 939, 941 (2d Cir.1951), reasoned that the absence of language equivalent to the Carmack amendment permitted the carrier to file a tariff exculpating itself entirely from liability from loss of particular classes of articles, including jewelry; and that in any event the reasonableness of such an exclusion of liability under the doctrine of primary jurisdiction must first be submitted to the CAB. Judge Jerome Frank dissented. Id. at 942. The weight of authority now supports Judge Frank's view. As Judge Hufstedtler held in Klicker v. Northwest Airlines, Inc., 563 F.2d 1310, 1313-14 (9th Cir.1977): "We decline to adopt the Lichten rationale because it is flatly wrong."
 
 
 [6]
 In Allegheny defendant also relied on tariff provisions requiring a timely claim (similar to a statute of limitations) and an exclusion of liability for consequential damages. 479 F.Supp. at 641
 
 
 [7]
 Another Third Circuit case pertinent here is Rhoades v. United Air Lines, 340 F.2d 481, 486 (3d Cir.1965), from which it may be inferred that the airline could have limited its liability if it had properly communicated the terms of its tariff to the shipper
 In that respect Rhoades resembles Anton v. Greyhound Van Lines, 591 F.2d 103 (1st Cir.1978), where a motor carrier was held liable for the full value of the goods shipped when the carrier failed to procure the shipper's signature to the bill of lading. To limit liability to an agreed valuation, it is necessary that the shipper agree to the value stated in the tariff terms for shipment at the lower rate.
 Election to ship under a tariff containing limitation of liability provisions suffices to manifest the shipper's acceptance of the valuation, even if it is not embodied in the transportation documents. Tishman & Lipp, Inc. v. Delta Air Lines, 413 F.2d 1401, 1403-04 (2d Cir.1969). The Second Circuit further held in North American Phillips Co. v. Emery Air Freight Corp., 579 F.2d 229, 232-33 (2d Cir.1978), that:
 Limitations of liability and cargo valuations are inherent parts of the rates, and the statutory mandate of uniformity must therefore apply to the liabilities which attend the carriage of goods .... If a shipper in one state could hold a carrier to a higher standard or degree of liability than a shipper in another state who has paid the same rate, the first shipper would be getting a preference not granted to the second ....
 Although the liability of air carriers is not created by statute, as is the case with surface carriers, ... the prohibition against unlawful preference is equally strong with regard to the former as the latter.
 
 
 [8]
 The regulatory authority established by the 1938 Act was called the "Civil Aeronautics Authority" (Sec. 201(a), 52 Stat. 980) but for convenience we use the name now familiar "Civil Aeronautics Board" accepted by the 1958 Act (Sec. 201(a)(1), 72 Stat. 741) after being adopted by an Executive reorganization plan in 1940
 
 
 [9]
 The declaration of policy in Sec. 2 of the 1938 Act favored "The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service and of the national defense;" and "The encouragement and development of civil aeronautics." 52 Stat. 980
 
 
 [10]
 One of the great evils that led to the enactment of the Interstate Commerce Act in 1887 was rebating. The Standard Oil Company's rebates were notorious
 
 
 [11]
 Sec. 404(a) of 1938 Act, 52 Stat. 993; [1958 Act, 72 Stat. 760]
 
 
 [12]
 Sec. 404(b) of 1938 Act; [1958 Act, 72 Stat. 760]
 
 
 [13]
 Sec. 1002 of 1938 Act, 52 Stat. 1018-20; [1958 Act, 72 Stat. 788-90]. Classifications, rules, regulations, practices, and divisions of rates among participating carriers are likewise subject to the agency's authority to prescribe
 
 
 [14]
 See Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 439-41, 27 S.Ct. 350, 354-56, 51 L.Ed. 553 (1907). The need for national uniformity in determinations of reasonableness was an important factor stressed in Justice White's opinion as a justification for the requirement of "primary jurisdiction."
 
 
 [15]
 As will be seen, this change was brought about by CAB action pursuant to statutory authority to exempt carriers from statutory requirements when the Board considers such action to be appropriate and in the public interest. The Board exercised its dispensing power with respect to sections 403 and 404(a) of the Act
 
 
 [16]
 When the Board by the hereinafter described 1977 amendment to Sec. 1002 lost its power to enforce, with respect to carriers of property, the requirement of reasonableness mandated by Sec. 404(a), the Board apparently saw no reason why that requirement should still stand as a statutory brutum fulmen which carriers were theoretically obliged to observe. A lawyer wedded to technicalities might criticize the Board for confusing right and remedy
 
 
 [17]
 See 43 Fed.Reg. at 53631
 
 
 [18]
 See note 4 supra
 
 
 [19]
 Previously this section had permitted exemption only "to the extent necessary" and only if the Board found "that the enforcement of this title or any provision thereof ... is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operation of such air carrier or class of air carriers and is not in the public interest." 72 Stat. at 771
 
 
 [20]
 See note 19 supra
 
 
 [21]
 However, complaints of discrimination can still be considered by the CAB since deregulation. DHL Corp. v. C.A.B., 659 F.2d 941, 944-45 (9th Cir.1981); see 49 U.S.C. Sec. 1482(d)(3) (Supp. V 1981)