Herman **NEAL, et al., Plaintiffs,**

v.

**REPUBLIC AIRLINES, INC.,
Defendant.**

No. 84 C 10034.

United States District Court,
N.D. Illinois, E.D.

March 27, 1985.

Stephen E. Smith, Gottlieb & Schwartz, Chicago, Ill., for plaintiffs.

N.F. Thompson, Lord, Bissell & Brook, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

All the children and heirs at law of Rozena Neal ("Mrs. Neal") filed this diversity action against Republic Airlines ("Republic") for damages arising from Republic's failure to deliver Mrs. Neal's remains to Columbus, Mississippi on November 24, 1982 as promised. Plaintiffs' six-count

Complaint purports to state causes of action against Republic based on allegations of breach of contract, negligence, bailment, res ipsa loquitur, negligent infliction of emotional distress and gross negligence. Republic has now moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment on all six counts. For the reasons stated in this memorandum opinion and order, Republic's motion is granted.

### Facts[1]

Mrs. Neal died in Chicago November 23, 1982, having previously expressed the wish to be buried in her birthplace, Sullijent, Alabama. Arrangements were immediately made with Inman Nationwide Shipping ("Inman") to ship Mrs. Neal's remains from Chicago to Alabama. Inman in turn contracted with Republic to transport Mrs. Neal's remains by air from Chicago to Columbus, Mississippi (the airport nearest to Sullijent). There Mrs. Neal's remains were to be delivered to Norwood Funeral Home ("Norwood"), which had agreed to carry them to Sullijent.

Upon receipt of Mrs. Neal's remains at O'Hare International Airport, Republic issued an airbill to Inman providing for shipment on November 24 via Republic's flight 480. Through some error, Mrs. Neal's remains were not transported on flight 480 but were instead shipped on other flights from Chicago to Memphis to Atlanta to Greenville, Mississippi and then back to Memphis again. They did not arrive in Columbus until the afternoon of November 25, approximately 24 hours later than expected. That delay, according to Complaint ¶ 31, "interfered with the timely and proper burial of their mother by plaintiffs."

### Counts II–VI

Republic contends Counts II–VI (sounding in negligence, bailment, res ipsa loqui-

tur, negligent infliction of emotional distress and gross negligence) fail to state claims upon which relief can be granted. That contention is grounded in doctrine well-settled in the case law well before 1979 (which, as will later be seen, plaintiffs urge is a watershed year). As *Blair v. Delta Air Lines, Inc.*, 344 F.Supp. 360, 365 (S.D.Fla.1972) (citations omitted) said:

It is also clear that tariffs, if valid and accepted by the C.A.B. [the Civil Aeronautics Board, "CAB"], may contain exculpatory clauses for certain classes of freight and limitations of liability for loss or damage to specified property, regardless of fault.... The established rule is that the tariffs, if valid, constitute the contract of carriage between the parties and "conclusively and exclusively govern the rights and liabilities between the parties." *Mao v. Eastern Air Lines, Inc.*, 310 F.Supp. 844, 846 (S.D.N.Y.1970).

That statement of the law reflects principles derived from the common law of common carriers. While the common law generally held a carrier should not be able to avoid liability for its own negligence, it distinguished the case where a carrier calculated the carriage rate on the declared value of the property shipped. In that instance (*First Pennsylvania Bank v. Eastern Air Lines, Inc.*, 731 F.2d 1113, 1116 (3d Cir.1984)):

In a suit against the carrier in such a case, the carrier's negligence was assumed to exist, rather than avoided; the limitation of the shipper's damages to the agreed value was merely a consequence of the assumption that the agreed upon value was the true value of the property transported.... The agreed upon value merely constituted an estoppel against the unfairness of asserting a larger amount as the true value when the carri-

---

1. Familiar Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein*,

742 F.2d 350, 353 (7th Cir.1984). Because Republic's motion (depending as it does on rules of law applicable to *plaintiffs'* version of the facts) comes before the completion of any substantial discovery in the case, the summary in the text is based in principal part on the factual allegations in the Complaint. There is no quarrel between the parties as to the relevant facts.

er was sued for damages in spite ·of the fact that a smaller value had been used to calculate the rate.

That rationale stands up, of course, only on the assumption that a shipper has had a fair opportunity to declare a value for the property shipped and to pay the corresponding rate. See *Fireman's Fund Insurance Cos. v. Barnes Electric, Inc.*, 540 F.Supp. 640, 645 (N.D.Ind.1982). Once air carriers were required to file tariffs with the CAB, which in turn reviewed them and required publication of those it approved (see 49 U.S.C. § 1373 (1976)), shippers were presumed to have knowledge of the liability limits corresponding to the carriage rates they agreed to pay. Thus the federal law regulating air carrier tariffs arose in the context of and operated in conjunction with the existing common-law· doctrine of declared or released value rates. See *First Pennsylvania Bank*, 731 F.2d at 1116–17.[2]

■ Under the regime just outlined, then, a shipper seeking damages from a carrier for delay in delivery or loss of property is bound by the terms of the carriage contract. Consequently the shipper ·may not, by recasting the form of action, escape the effect of a valid stipulation restricting liability to the declared valuation. See *Young v. Delta Air Lines, Inc.*, 78 A.D.2d 616, 432 N.Y.S.2d 390 (1980) and cases there cited. Where (as here) it is clear plaintiffs seek damages for breach of the carriage contract with Republic, they may not avoid that contract's liability limits by framing their complaint in terms of bailment and tort. They must proceed, if at all, on a breach of contract theory.

In a misguided effort to avoid dismissal of Counts II–VI, plaintiffs argue the reasoning· of the pre-1979 cases no longer represents good law because in late 1978 the CAB, acting under the authority of the Airline Deregulation Act of 1978, 49 U.S.C. § 1551, issued regulations exempting air carriers from tariff filing requirements. See Regulation ER–1080, *Operating Rules*

*for All-Cargo Carriers and Domestic Cargo Transportation by Section 401 and 418 Carriers*, reissuing part 291 of *General Rules for All Cargo Carriers*, 14 C.F.R. Part 291 (1979). Plaintiffs' Mem. 1 contends the lifting of the filing requirements for air carriers "voided their ability to hide behind limitations of liability in the tariffs that they had previously filed."

■ But as the discussion earlier in this opinion suggests, the common-law doctrine of declared value rates predated the tariff filing scheme. All the pre-1979 CAB-filed tariffs did in that respect was to create a system of constructive notice to shippers (somewhat akin to the recording system for documents affecting real estate—or aircraft—titles). While Regulation ER–1080 —whose aim was to leave the setting of air carriage tariffs to market forces—meant air carriers could no longer *presume* a shipper's notice of CAB-approved tariffs, it did not bar the carriers themselves from providing shippers with the requisite notice of declared value rates. As *First Pennsylvania Bank*, 731 F.2d at 1120 put it:

> With respect to rates, a succinct statement of the effect of the deregulation would be that the CAB was shorn of its powers to pass upon the reasonableness of rates for interstate air transportation of property, and to prescribe future rates to replace those found to be unreasonable. Abolition of these powers of the CAB simply abrogated *pro tanto* the doctrine of "primary jurisdiction" with respect to such rates. The courts were thus left free to proceed without circuity to apply directly the familiar federal common law rules relating to the subject matter of released value rates.

■ Here there can be no doubt Inman, as shipper, did have actual notice of Republic's tariffs and an adequate opportunity to declare a higher value for the shipment. Republic's airbill to Inman (Complaint Ex.

---

**2.** Though the doctrine of declared value rates has been applied by both state and federal courts, its status as a doctrine of federal common law is of interest for purposes of this case.

Both sides agree, and the case law makes plain, that contracts for interstate carriage are governed by federal law. See *First Pennsylvania Bank,* 731 F.2d at 1115–19.

1) states twice on its face (once at the top and once in the space provided for the shipper's signature) that it is subject to the "Conditions of Contract" set out on the reverse. Those include specific liability limitations:

Carriage is subject to the Carrier's governing rules, rates, and classifications, stated in the most recent Official Airline Freight Rate Tariff. Such rules, rates, and classifications are incorporated into this Contract and are available for inspection by the parties hereto at all points where Carrier's air freight transportation is sold or shipments are accepted by the Carrier.

\*     \*     \*     \*     \*     \*

A shipment shall have a declared value of $0.50 per lb. (but not less than $50.00) unless a higher value is declared on the airbill at the time of receipt of the shipment from the shipper, and if a higher value is so declared, an additional transportation charge of $0.40 shall be required for reach $100.00 (or fraction thereof) by which such higher value exceeds $0.50 per lb. or $50.00, whichever is higher.

Carrier shall not be liable for special or consequential damages unless, at the time of receipt of the shipment, Carrier is given notice in writing on the airbill of the circumstances which could result in such damages. Carrier's liability for such damages shall not exceed the declared value of the shipment.

\*     \*     \*     \*     \*     \*

By tendering the shipment to the carrier for transportation, the shipper, for himself and all other parties having an interest in the shipment, agrees to the limitations set forth in these rules and affirms the description of the shipment as recited on the airbill and the fact that the shipment is not of a nature unsuitable for the carriage by air or hazardous thereto.

Those conditions provide unequivocal notice of Republic's rate and liability structure, affording Inman ample opportunity to have declared a value in excess of the contract-specified amount of $0.50 per pound. Inman did not. Accordingly neither Inman nor those on whose behalf it acted—parties with an interest in the shipment—may look to anything but the airbill itself as a basis for recovery from Republic. Counts II–VI are dismissed with prejudice.[3]

### Count I

Although Republic acknowledges it is open to suit for breach of the carriage contract, it challenges Count I on the ground that plaintiffs are not in a position to assert that contract claim. Republic points out the airbill identifies Inman as the shipper and Norwood as the consignee.

---

**3.** In a further effort to escape this result, plaintiffs also argue wilful conduct on the part of the carrier will void contractual liability limits. They say Count VI, which alleges wanton and wilful conduct against Republic, must then survive. That argument is faulty in two respects:

1. Where interstate carriage is concerned, only an appropriation of property by the carrier for its *own* use is sufficient to get around limits on liability. Wilful misconduct is not enough. See *Rocky Ford Moving Vans v. United States*, 501 F.2d 1369, 1372–73 (8th Cir.1974); *Glickfield v. Howard Van Lines, Inc.*, 213 F.2d 723, 727 (9th Cir.1954). Plaintiffs' citation of *Tarar v. Pakistan International Airlines*, 554 F.Supp. 471, 478–79 (S.D.Tex.1982), a case decided under the Warsaw Convention, is simply inapt. Article 25 of the Warsaw Convention provides explicitly: (1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such other default on his part as, in accordance with the law of the Court to which the case is submitted, is considered to be equivalent to wilful misconduct.
No similar provision covers the contract of carriage at issue in this case.

2. Even if wilful misconduct *were* enough to void the liability limits of Republic's airbill, plaintiffs have offered no factual basis (even with the benefit of reasonable inferences) for plaintiffs' Count VI allegations (see Rule 56(e)). After all Mrs. Neal's remains were delivered only 24 hours later than promised and only 48 hours after her death. There is no indication, moreover, that the shipment was mishandled or damaged apart from the delay.

It nowhere identifies plaintiffs as parties to the carriage contract. Under those circumstances, Republic argues, its liability runs to the parties with whom it dealt, not to parties who stand at some remove from the transaction.[4]

■ That argument does not directly address plaintiffs' allegation (Complaint ¶ 14) that they are third-party beneficiaries of the carriage contract with Republic, but it does point to the poverty of that assertion. It is hornbook contract law that a third-party beneficiary must be an *intended* beneficiary of the performance of the contract. *Restatement (Second) of Contracts 2d* §§ 302, 304 (1981). With Republic having no specific awareness of plaintiffs' existence or of their interest in the contract, it is wholly implausible to conclude they were intended beneficiaries. At most they were incidental beneficiaries of Republic's performance and as such have no right to sue. *Id.*

■ To turn from the general law to the specific, the law governing the liability of interstate carriers makes plain that in cases involving an intermediate freight handler between the carrier and the original shipper, the carrier's liability runs to the middleman alone. As the Supreme Court stated in *Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 487, 69 S.Ct. 692, 702, 93 L.Ed. 817 (1949), setting out the long standing rule applicable to such three-party cases:

> As shippers, [freight forwarders] have, of course, always had a right of action against the underlying carrier at fault. The defense that the goods are not those of the forwarder is not open to the carrier, since, as we have held, the carrier is not concerned with questions of ownership, but must treat the forwarder as shipper.

See also *Montgomery Ward & Co. v. Peter J. McBreen & Associates*, 40 Ill.App.3d 69, 72, 351 N.E.2d 324, 326 (1st Dist.1976) (citing *Acme Fast Freight* and holding an air carrier's liability for loss of cargo runs to the freight forwarder, not to the original shipper). While plaintiffs may have a claim against Inman or Norwood, they are not in a position to state one against Republic.[5] Republic's motion must be granted as to Count I as well.[6]

### Conclusion

There is no genuine issue of material fact. Republic is entitled to a judgment as a matter of law on all six counts of the Complaint. This action is dismissed with prejudice.

---

4. Indeed it is not clear just where plaintiffs stand in relation to Republic. It is possible—though it seems unlikely—that plaintiffs approached Inman directly to arrange for shipment of Mrs. Neal's remains. It is much more likely that plaintiffs approached either Norwood or an unnamed third party in Chicago who in turn made arrangement for shipment with Inman. In any event there is no indication plaintiffs dealt directly with Republic, and that controls the current motion. At best plaintiffs relied on Inman to arrange for timely delivery. This opinion does not of course deal with any claim they may have against Inman, not Republic.

5. Indeed, even were neither of those fatal flaws applicable to defeat plaintiffs' contract claim, the terms of the contract itself would likely do so. As third-party beneficiaries, plaintiffs would have to take the contract as they found it. Condition 7 of the contract reads in part:

Claims for non-delivery must be filed within 9 months and 9 days of shipment date.

If "non-delivery" includes failure to deliver when promised, plaintiffs (who sued *two years* after the delayed delivery) are out of time. And of course they cannot rely on the timely claim by Norwood, the only claim Republic knew about and one that Republic promptly settled.

6. This Court therefore need not consider Republic's arguments directed to the contingency of a viable breach-of-contract claim. Several would defeat the claim entirely (see, e.g., n. 5). And of course even if plaintiffs did have such a claim and even were they deemed to have satisfied all the contractual conditions, their recovery would be limited to $130 (260 pounds at $0.50 per pound) by virtue of the liability limits applicable under the declared value rates doctrine.